## HUMPHREYS-MEXIA COMPANY V. J. ARSENEAUX ET AL.

No. 3900. Decided June 22, 1927.

(297 S. W., 225).

**1.—Judicial Notice—Natural Features of State.**

Courts will take judicial notice, as matters of common knowledge, of the natural features of the State, including the general location of its mountains and the courses of its rivers. Hoefs v. Short, 114 Texas, 501. (P. 609).

**2.—Water Course—Riparian Water Rights.**

Evidence here considered is held to show plainly that the Navasota River, whether in flood stage, normal flow stage, or standing in pools, furnishes the advantages usually attendant upon streams of water, and is therefore a stream to which water rights, whether riparian or by appropriation, attach. Hoefs v. Short, 114 Texas, 501. (P. 610).

**3.—Riparian Proprietor—Right to Take Water From Stream.**

A riparian proprietor as such has the right to take water from the stream and use it or sell it for use on either riparian or non-riparian land unless it thereby interferes with the rights of some other riparian owner. (P. 610).

**4.—Same—Equity.**

A court of equity would not, even at suit of a riparian owner, enjoin the diversion of riparian water unless the complainant was injured thereby or circumstances showed an adverse user of sufficient moment to set in motion the Statute of Limitation or prescription. (Pp. 610, 611).

**5.—Riparian Waters—Standing Pools.**

All the waters of a stream below the highest line of its normal flow are riparian waters, and include waters of the stream in holes or pools after the stream has ceased to flow. Though they then become mere lakes or ponds, riparian rights to take water therefrom attach to them regardless of their origin, whether from flood waters or otherwise. (P. 611).

**6.—Same—Flooding Land of Another—Bed of Stream.**

Where the bed of the stream is privately owned a riparian proprietor may erect a dam to back and impound water therein as far as his riparian rights extend, but no further. If he backs and impounds water on the

lands of an upper proprietor, though only in the bed and confined by the banks of .the stream, his act is a trespass and constitutes an abatable nuisance.   (Pp. 612, 613).

### 7.—Same—Statute—Appropriating Flood Waters.

The right obtained under the statute from the Board of Water Engineers to impound and appropriate flood waters of a stream carried with it no right to use the bed and banks of the stream belonging to a superior riparian proprietor owning to its center as a reservoir for impounding such flood waters.   (P. 614).

### 8.—Same—Equity—Coming With Clean Hands.

Though the use of storm water lawfully appropriated under the statute and by authority of the Board of Water Engineers, by a superior riparian proprietor onto whose land the dam of the statutory appropriator had backed same, be considered unlawful, the appropriator who by trespass and erection of a nuisance had so backed the water on the others' land does not come into court with clean hands and is not entitled to an injunction to restrain such use of the water by the other.   (Pp. 614, 615).

Error to the Court of Civil Appeals for the Fifth District, in an appeal ·from Limestone County.

The Humphreys-Mexia Co. appealed from a judgment refusing an injunction against the Oil Well Water Co., and on affirmance (244 S. W., 280) obtained writ of error.

*C. S. Bradley,* and *Vinson, Elkins, Wood & Pollard,* for plain-

The lands to which defendant in error is diverting the water not being riparian, it cannot divert the water of the stream for use thereon and the riparian owner, who was appellee's grantor, could not confer upon defendant in error any right to do so. Watkins Land Company v. Clement, 86 S. W., 738; Santa Rosa Irrig. Co. v. Pecos River Irrig Co., 92 S. W., 1014; Long on Irrigation, 93; Gault v. Eaton, 49 Pac., 577, 38 L. R. A., 181.

Neither party to this cause owns the title to any riparian land abutting upon the Navasota River, and both parties seek to use and are using the storm and flood waters on non-riparian lands and for non-riparian purposes.   The rights of no riparian owner being involved, and plaintiff in error being first in time of regular statutory appropriation, and the defendants in error not pretending to assert any right under a statutory appropriation of any sort, or any claim thereunder, it should be enjoined from diverting water from plaintiff in error's reservoir, to its damages, and in violation of its rights.   Matagorda Cattle Co. v. Markham Irrig. Co., 154 S. W., 1176; 27 R. C. L., 1257, 1177, 1280.

*Harmon & Parker* and *E. B. Robertson,* for defendant in error.

COMPOSITE MAP
DRAWN FOR
THE SUPREME COURT
By
H.U. von Rosenberg
Texas Reclamation Department
Austin
Scale · 1 inch · 450 varas

A riparian owner may use or sell to others to be used on non-riparian lands and only lower riparian owners can complain when such use is unreasonable (27 R. C. L., 1128-29). Also to the same effect Baker v. Brown, 55 Texas, 377; Watkins Land Company v. Clements, 98 Texas, 578; Martin v. Burr, 171 S. W., 1044; Barrett v. Metcalf, 33 S. W., 758; Board of Engineers v. McKnight, 229 S. W., 301; Boyd v. Motl, 236 S. W., 487, Section 17 and 19 Article 1, Constitution of Texas.

The cases of Martin v. Burr, 171 S. W., 1044, Watkins Land Company v. Clements, 98 Texas, 578; Boyd v. Motl, 236 S. W., 487, and other cases cited heretofore all hold that the rights of a riparian owner are superior to the rights of anyone holding under a water permit.

MR. CHIEF JUSTICE CURETON delivered the opinion of the court.

This suit was instituted by plaintiff in error, Humphreys-Mexia Company, against defendants in error, Oil Well Water Company and J. Arseneaux, for the purpose of enjoining the last named parties from pumping, drawing off, diverting, selling, or otherwise disposing of water from a certain reservoir made by a dam across the Navasota River, constructed by the former. The trial was upon hearing of an application for a temporary injunction, which was refused. The case was appealed, and the Court of Civil Appeals affirmed the judgment of the trial court. 244 S. W., 280. The map attached, drawn under our direction from two maps introduced in evidence and the testimony of the witnesses, represents in a general way the locus of the controversy and some of the points to which the witnesses referred.

There were four dams constructed by the Oil Company, for the purpose of obtaining water for the operation of its extensive drilling operations in the Mexia oil field: one dam about one mile below the area marked "Reunion Grounds" on the map; one at the "Reunion Grounds" as indicated; one between the J. Pinkard and G. B. Echols tracts of land, designated as Dam No. 2; and another at Comanche crossing. Since there are four different Echols tracts of land referred to in the testimony and shown on the maps in evidence, we have designated the G. B. Echols and J. Pinkard tracts as Oil Company tracts, although the only rights claimed by the Oil Company as to this land was to construct Dam No. 2 between the surveys, and of course impound the storm waters of the river. The Water Company, by which name we will refer generally to the defendant in

error, owned all the riparian rights in the Nick Echols, George Echols, and Joe Echols surveys, and for convenience we have designated each on the map "Water Company Tract." (There being no facts developed against Arseneaux, he passes out of the case, and will not be further noticed). The effect of the construction of the four dams named, only three of which are shown on the map, was to impound the waters of the Navasota River from a point about one mile below the Reunion Grounds to a point, according to the testimony of Col. Humphreys, between eight and ten miles up the river. Each of the several dams, when the impounded water reaches the level of its spillway, backs the water to the foot of the next succeeding dam above. The effect of the construction of Dam No. 2, which together with the reservoir which it creates forms the basis of the subject matter of this litigation, was to back the water up the river for a distance of seventeen thousand six hundred feet, to the foot of the dam built at Comanche crossing.

Some months after Dam No. 2 was constructed by the Oil Company, the Water Company built a pump station at the point indicated on the map, from which it pumped water from that section of the Navasota River lying between the dam at the Comanche crossing and Dam No. 2, and sold it to concerns drilling oil wells in the Mexia Field, carrying its pipelines altogether some five miles or more, and delivering water on lands out of an original riparian survey, but which by subdivision had been cut off from contact with the river. The Water Company claimed the right to do this by virtue of their riparian proprietorship of three tracts of land designated on the map as "Water Company Tracts."

On the other hand, the Oil Company claimed the right to construct Dam No. 2 and impound the waters of the river, as it did so, by virtue of a statutory appropriation of the flood waters of the stream, granted by the State Board of Water Engineers.

The plaintiff in error alleged and contended that the Navasota River was not a natural flowing stream; that it flowed only during rainy seasons from storm and flood waters; that the storm and flood waters constituted and were unappropriated waters of the State, subject to the exclusive appropriation of those complying with the provisions of the statutes relative to the same; and that since it had complied with these statutes, and obtained the permit to use these waters, it was entitled, under the law, to the exclusive right to the impounded waters against the defendant in error; and charged that the

Water Company, in thus diverting the water from the reservoir created by the construction of Dam No. 2, was violating its rights and trespassing upon its property, for which it had no adequate remedy at law. Plaintiff in error alleged that the Water Company was without lawful authority to take and sell the water as it was doing, for use upon non-riparian land; that the acts of the Water Company constituted a wrongful diversion of the water for purposes not authorized by law, and that this was an unlawful trespass upon the Oil Company's rights, for which it had no adequate remedy.

The evidence showed that it did obtain a permit from the Board of Water Engineers of the State to appropriate the storm and flood waters in Navasota River, in Limestone County, to the extent of 100 acre-feet of water per annum, and to construct a storage dam in the bed of the river, which in this particular case is Dam No. 2 shown on the map. The dam as authorized was to be constructed in a substantial way, of rock and concrete, 120 feet in length, 8 feet wide at the bottom, 3 feet wide at the top, and 6 feet high; thereby creating a reservoir with an average width of 41 feet, a length of impounded water of 17,600 feet, with an average depth of stored water of 4 feet, and having a storage capacity of 66.2 acre-feet. The dam was constructed as authorized, at a cost of from $7,500 to $10,000.

The permit granted the Oil Company authorized it to impound only "public waters of the State to consist of the *storm and flood waters* of the Navasota River in Limestone County," and was expressly prohibited from impounding "any part of the *normal flow* of said stream."

In addition to the permit from the State, the Oil Company obtained from G. B. Echols and wife and the heirs of Pinkard the perpetual right to construct and maintain Dam No. 2 between their premises, shown on the map. The Oil Company, however, did not bring this suit upon the theory that it had any riparian rights in the river, but solely upon rights claimed by virtue of the issuance to it of the water permit by the Board of Water Engineers. Its contention in fact was that the Navasota River was not a riparian stream. Its position below and here is well stated in its first proposition, as follows:

Appellee's defense in this suit being based upon alleged claims to riparian rights, *and the Navasota River not being a water course to which such rights attach,* the use of its flood waters are within the control of the Legislature, and appellant having lawfully appropriated same, appellee should be enjoined from diverting it from appellee's reservoir." (Italics ours.)

The Water Company did not claim under any rights by appropriation, but asserted the right to pump the water out of the river and sell the same for mining purposes on both riparian and non-riparian land, purely as a riparian proprietor.

The Oil Company had no kind of conveyance, easement, or evidence of any kind or character, of any right to the bed of the river adjacent to the three tracts of land marked "Water Company Tracts," or adjacent to the intervening tract, which we have marked on the map "Unidentified," since no name is given it on either of the maps introduced in evidence. The Oil Company, in so far as this record shows, had no type of right to back up the water above the corner of the J. Pinkard and S. Medlock tracts, shown on the map, and as to the space between the lower boundary of Nick Echols' twenty-five-acre tract and the corner of the Pinkard and Medlock tracts, referred to, its right extended, in so far as any conveyance is shown, only as far as the rights of the Pinkard heirs extended, which was only to the middle of the stream. So, we may correctly say that, in so far as this record is concerned, the Oil Company had no conveyance, oral or written, of any easement or right to impound waters up the river from the lower boundary of the Nick Echols twenty-five-acre tract; unless, of course, the permit granted by the Board of Water Engineers gave it that right.

On the trial of the case it was admitted "that the boundary lines between the respective owners extended to the center of the stream." We will dispose of the case upon this admission, without determining whether or not the stream is in fact a public or private one.

The trial court no doubt found, and the Court of Civil Appeals quite correctly concluded, that:

"The proof shows that the river is fed at its source by springs and tributary streams; that along its course springs exist, at least some of which never entirely fail; that a well-defined channel, cut by the force of the flowing water, exists; that the banks are clearly marked; and that the river wanders to another stream into which its waters are discharged; that its course is permanently and clearly marked everywhere by a bed naturally made by the waters; that during certain seasons of the year the river regularly flows without intermittence; that in extremely dry summers it stands in holes but is never absolutely dry. Such a stream is a natural water course in which the water moves from its source to its mouth."

A full review of the evidence is, we think, unnecessary. To

what the Court of Civil Appeals has said, however, we will make some addition.

The evidence describes the river through the section occupied by the reservoir, which is some eight or ten miles. Its width varies from forty to seventy-five feet. Since the construction of the reservoir it is perhaps some wider than this. It flows a large amount of water when rain falls, and runs for a long time thereafter. During the winter and rainy seasons it runs as does any other stream. One of the witnesses says the river runs more than half the time. When the stream does not flow, its water stands in long, deep pools or holes, which contain large quantities of water. The hole adjacent to the Water Company's Tracts, where its pumping station is located, has never been dry, but has always been 12 or 15 feet deep at the lowest stage of the river. The witness who made this statement had lived within a quarter of a mile of the river on this tract of land for 42 years. This hole is 65 feet wide at its narrowest point, and is, as we conclude from the evidence, (which, however, is not very definite), a quarter of a mile long. At the time of the trial this pool was 17 feet deep at the pump station, and no shallower water down to Buffalo hole, located about a quarter of a mile down the river. Taking the minimum depth of the pool opposite the pumping plant of the defendant in error at the lowest stage of the river, and the length and breadth as stated, it is a mere matter of calculation to show that when the water there stands merely as a pool, it holds some 23 acre-feet, or approximately 183,000 barrels of water, an amount sufficient to run the Water Company's pump station at its maximum capacity, as it existed at the time of the trial, for more than 70 days. These figures may not be absolutely accurate, but they are an approximation clearly deducible from the evidence. The Buffalo hole, a short distance below the one above named, is half a mile long and deeper. There are some large and deep holes of water above the Nussbaum bridge, at least one of which is of such magnitude as to carry a local name,—that is, the Teamer hole.

In addition to the testimony, we may take judicial notice as matters of common knowledge of the natural features of the State, including the general locations of its mountains and the courses of its rivers. Hoefs v. Short, 114 Texas, 501. We therefore judicially know that the Navasota River is in its general aspects a well-known stream of some magnitude in this State; that it rises in Hill County, and flows in the familiar eastward-bearing arc characteristic of Texas streams of any

size, running towards the Gulf of Mexico, and after traversing a portion or all of Hill, Limestone, Leon, Robertson, Madison, Brazos, and Grimes Counties, empties into the Brazos River in Washington County, traversing an arc the cord of which is approximately 100 miles. It is the major stream which drains the interfluve between the Trinity River on the north or northeast and the Brazos River on the south or southwest, rising between the 31st and 32d parallels of Latitude, and east of the 97 degree of Longitude.

See the maps accompanying Water Supply Paper No. 335, issued by the United States Geological Survey, and the Geological Map of Texas, by the Bureau of Economic Geology of the University of Texas.

The evidence plainly shows that the Navasota River, in the section here involved, whether in flood stage, normal flow stage, or standing in pools, "furnishes the advantages usually attendant upon streams of water," and is, therefore, a stream to which water rights, whether riparian or by appropriation, attach. Hoefs v. Short, 114 Texas, 501, and authorities there cited.

The defendant in error is a riparian proprietor, and as such had the legal right to take riparian water from the stream, and use it or sell it for use on either riparian or non-riparian land, unless it thereby interfered with some other riparian owner. Texas Company v. Burkett (decided by the Supreme Court at this term, but not yet officially reported), and authorities there cited. In addition to the authorities cited in the Burkett Case, we direct attention to Mr. Farnham's work on Water Rights, Vol. 2, Sec. 497, where he says:

"A riparian proprietor cannot confer upon another person the right to divert water from a stream to use on non-riparian lands to the injury of a lower proprietor, since the riparian owner himself has a right to divert waters to riparian lands only. There are some exceptions to the rule as thus broadly stated. Such a rule would impose a needless hardship on the upper owner, and confer no corresponding benefit on the lower owner. *Therefore, to give the lower owner a ground of complaint, the quantity taken to the non-riparian land must be sufficient to inflict a perceptible injury on him. And if the riparian owner wishes to enjoy his right by selling or leasing the water, he may be permitted to do so, although the right is to be enjoyed on non-riparian lands.*" (Italics ours.)

Upon the principle stated it is obvious that a court of equity would not, even at the suit of a riparian owner, enjoin the diver-

sion of riparian water, unless the complainant was injured thereby, or under circumstances that would reasonably show a hostile and adverse user of sufficient moment to set in motion the statute of limitation, or prescription. Farnham on Waters, Vol. 2, Sec. 505a. The Oil Company in this case, however, not being a riparian owner, could not object to the diversion of riparian water, and was not entitled to an injunction to prevent such diversion, if any. This is so for the reason that the Oil Company had no justiciable interest in the riparian water.

All the waters in a stream below the highest line of its normal flow are riparian waters. Motl v. Boyd, 286 S. W., 458. They therefore necessarily include the waters of the stream in holes or pools, after the river has ceased to flow, since these waters are within the limit stated. In addition to this, all water when it comes, in the usual course of its migration, to rest permanently in a basin made by nature for that purpose, although it may have been flood water at one time, ceases to be flood water, and becomes a lake or pond. Water of this character comes within the usual physiographic definition of lakes and ponds, regardless of its origin. Tarr's College Physiography, Chap. 10, pp. 308 to 317. Salisbury's Elementary Physiography, pp. 99, 100, 143; Kinney on Irrigation (2d Ed.), Vol. 1, Secs. 294, 297, 298, 300. Without quoting from the books cited, to any extent, we simply direct attention to the fact that the first authority named, one of universal acceptation among scientists, states:

"A river bed is really a succession of basins of small size, and as such a stream dries up *a chain of tiny lakes succeeds the stage of running water.*"

It is an elementary rule that riparian rights attach to all natural lakes and ponds, regardless of origin. Long on Irrigation, Sec. 42; Wiel on Water Rights, Vol. 1 (3d Ed.), Secs. 346, 347, Vol. 2, Sec. 728; Rait v. Finrow, 6 L. R. A. (N. S.), 157, 161; Schaefer v. Marthaler, 57 Am. Rep., 73; Turner v. James Canal Co., 22 L. R. A. (N. S.), p. 401; Kinney on Irrigation (2d Ed.) Secs. 474, 475.

Under the last rule stated, as well as the first, there can be no doubt that the impounded water remaining in the Navasota River, after it had ceased to flow, is riparian water. So, on the whole, the defendant in error had the right to take riparian water from the Navasota River, as it was doing, and there is no evidence in this record that it ever took more than its just proportion, or that any lower riparian proprietor ever complained.

However, be that as it may, the plaintiff in error here was not entitled to an injunction against the defendant in error. The result of the construction of its dam was to flood that part of the river bed to which the Water Company was entitled, to-wit: that portion opposite the banks of the tracts of land marked "Water Company's Tracts," and appropriate it and the adjacent banks for impounding the flood waters of the plaintiff in error. This plaintiff in error had no authority to do. It could no more take the land of the Water Company in the river bed and use the adjacent banks for reservoir purposes, without the consent of that Company, than it could take the upland. The impounding of the water in this manner in the river bed of the Water Company, and by aid of the banks which were also its property, was a trespass and a wrong, in the continuance and execution of which a court of equity could not be asked to grant aid.

It is an elementary rule of law that while a riparian, or another with proper authority, may construct dams in streams for the purpose of making reservoirs, still, in doing so, they are not permitted to flood the lands of other riparians, or to back the water past the line of other owners of the streamway. Farnham on Waters, Vol. 2, Secs. 531, 547, 549, 550, 551, 564, 567; Haas v. Choussard, 17 Texas, 588; Booker v. McBride, 40 S. W., 1031; Batla v. Goodell, 115 S. W., 622; Kinney on Irrigation (2d Ed.), Vol. 1, Sec. 547, Vol. 2, Sec. 826.

In the instant case the plaintiff in error, by the construction of its Dam No. 2, backed the water over the entire bed of the river adjacent to the riparian properties of the defendant in error, and in so doing the plaintiff in error was guilty of a direct trespass, for which the defendant in error might have had redress in court. In Farnham on Waters, Sec. 547, supra, the author correctly states the rule:

"Although, as will be seen in a subsequent section, there are few cases which apply to the damming back of water, the rule that to entitle one riparian owner to complain of acts of another he must show that he has been injured, those decisions are not only against the weight of authority, but also are unsupported by principle. Any swelling of the stream over the line is an invasion of the rights of the upper owner, who has a right to the stream in its natural condition, which he may protect, not only for present needs, but for possible future ones. It constitutes a direct trespass upon his property which he may seek the aid of the courts to redress, and he is not bound to show that he is specially injured to maintain the action. * * * *

Throwing the water back on the upper land is a nuisance in and of itself, of which the upper owner may complain whenever he desires to do so, whether it is a direct injury to him or not. He has a right to have his land free from the water and can object to its presence whenever he chooses; and the lower owner has no right in the premises."

Again, the same author, in Section 549, says:

"The wrong comes in backing the water over the line, and the reasonableness or unreasonableness of the act of the lower owner is wholly immaterial."

In Sec. 564 he states the rule:

"The casting of the water upon the land of the upper proprietor is a tresspass or a nuisance, and the one who commits the act or contributes to it is liable for the injury caused by his act."

In fact, so strongly is the rule which we are invoking imbedded in the jurisprudence of English peoples that since the statutes of Edward IV the riparian proprietor thus injured by unlawfully impounded water has the right, if he can do so without a breach of the peace, to abate the nuisance and trespass by destroying the dam, if he chooses so to do, or by removing the water thus impounded on his premises.

Mr. Farnham, in his work cited above, in Sec. 579, on this question says:

"In the Year Book of 8 Edw. IV it is said that 'if water flows to another's land, and he stops the water course so that it floods my land, I may abate that which causes the estoppel, and he shall not have an action for my entry on his close because the stopping of the water was his own doing.' And this rule has been in force ever since, so that, in case a lower proprietor casts the water onto the land of the upper one, the latter may abate the nuisance if he can do so without breach of the peace. This may be done either by entering upon the land of the lower owner and destroying the obstruction, or by constructing a ditch which will remove the water from the pond. The creation of remedies by statute does not take away the right to abate the nuisance unless the statute expressly so provides. A statute making it a criminal offense to injure a milldam does not take away the common-law right to abate such dam as a nuisance, by tearing it down, when its effect is to throw back water to an injurious extent on the wheels of the abater's mill, although not to stop them entirely." See also Farnham, supra, Sec. 480.

The rule which we have stated and illustrated by various quotations is the one which has been adhered to by this Court

in this State from a very early date, as the Texas cases cited will show.

The fact that the statute authorizes the impounding of flood waters and their appropriation, does not grant the right to the appropriator, or even a lower riparian, to back the water over the property line of the upper riparian owner, where the title of the upper one extends to the thread of or across the stream, as in the instant case. Art. 4993, Vernon's Texas Statutes, 1922 Supplement, and subsequent Articles authorize the building of storage dams and the impounding of water in lakes and reservoirs, as was done in the instant case: but that Article expressly says: "Provided that nothing in this Act shall prejudice vested rights."

The State by the enactment of the statute did not intend that dams could be constructed in a stream bed in such way that the property of others would be taken without compensation; and no statute, even if so intending, would be effective to accomplish this purpose. In the case before us, under the admissions made, the stream is a private stream. It naturally presents a very different case for our determination to what would be presented if the stream were a navigable stream, either in fact or under the statute, with the bed owned by the State. We are confining this opinion and our adjudication to the type of stream made by the admission in evidence.

Adverting to statutes similar to our own, authorizing the construction of dams and the impounding of water, Mr. Farnham in his work which we are quoting from, Vol. 2, Sec. 552, says:

"The flooding of lands to create a pond or reservoir is virtually a taking of the land within the meaning the constitutional provisions that private property shall not be taken for public use without making compensation. Therefore, the legislature cannot authorize such flooding for a public use without making compensation, and it has no power to authorize it for a private use under any circumstances. And therefore the mere grant of authority to erect a dam will not entitle the grantee to set the water back across a boundary line."

The injunction sought was by the plaintiff in error, and the effect of granting it would have been to aid it in the continuance of a legal wrong and trespass. This remains so regardless of the use to which the defendant in error may make of the results of the trespass. We do not say the defendant in error has itself been doing wrong. But whether so or not, the relief sought by the plaintiff in error is one in equity, to obtain which

it must come into court with clean hands. It can have no relief here because of its trespass. Storey's Equity Jurisprudence, (14th Ed.), Vol. 1, Secs. 98, 99; Sanders v. Cauley, 113 S. W., 560; Wainscott v. Strode, 237 S. W., 196; Simpkins on Equity (2d Ed.), pp. 114, 115.

If it should be said that the Water Company is also trespassing, still the result is the same in an equity proceeding. Equity does not adjust differences between wrong-doers. The complainant is first judged and not until he has been found free taint does equity proceed to determine whether he has been wronged. Beer v. Landman, 88 Texas, 450; Fay v. Lambourne, 90 N. E., 1158; Weiss v. Herlihy, 49 N. Y. Supp., 81; Modern Horseshoe Club v. Stewart, 146 S. W., 1157; and authorities cited above.

From what has been said above, it follows that the temporary injunction was properly denied, and that the judgments of the District Court and Court of Civil Appeals must be affirmed. Both judgments are affirmed.