James W. ROBINSON et al., Plaintiffs,

v.

AMERICAN BROADCASTING COM-
PANIES et al., Defendants.

No. 2101.

United States District Court,
E. D. Kentucky,
Lexington Division.

June 1, 1970.

Stoll, Keenon & Park, Lexington, Ky., for plaintiffs.

Harbison, Kessinger, Lisle & Bush, Lexington, Ky., for defendants ABC and NBC.

Gess, Mattingly, Saunier & Atchison, Lexington, Ky., for defendant CBS.

Bleakley, Platt, Schmidt, Hart & Fritz, New York City, for movant National Tuberculosis & Respiratory Disease Association.

## OPINION

NEESE, District Judge (by designation):

This is an action by representative members of a class [1] of growers of burley tobacco within the commonwealth of Kentucky. The plaintiffs seek to invoke herein the original jurisdiction of this Court in a suit of a civil nature, cognizable as a case in equity,[2] where the matter in controversy exceeds the sum of $10,000, exclusive of interest and costs, and is between citizens of different states.[3] Each of the defendants is the owner, directly or through a subsidiary, of five very-high-frequency television transmission stations. Each of them operates also, and provides programs for transmission over, a network of such stations, most of which are owned by others.

The plaintiffs apply to this court of equity for the extraordinary relief of a permanent injunction. They complain that the defendants are transmitting as a public service pictorial messages, usually accompanied by sound, which announce, directly or by innuendo, that the smoking of cigarettes will kill those persons who smoke them. The plaintiffs contend that such announcements result in irreparable injury to them, through the diminution in value of lands which they, respectively, own and in and upon which they grow burley tobacco crops; and that unless restrained, the continuation by the defendants of the electronic transmittal of such messages will curtail, if not destroy, the market for cigarettes, for which they provide much of the necessary tobacco, and will bring yet further decrease in the value of their land-ownerships. It is contended by the plaintiffs that the defendants transmitted these public service announcements, when they were known to be false, or at least did so in reckless disregard of their truth or falsity, " * * * because there is no scientific evidence of any causal connection between cigarette smoking and lung cancer, heart disease, tuberculosis, and bronchial or respiratory disorders * * *."

■ Equity does not adjust differences between wrongdoers. At the very threshold, the plaintiffs themselves must be judged; and, not until they have been found free from taint will equity proceed to determine whether they have been wronged by the defendants.[4] It is fundamental to equity jurisprudence that those who come to equity for relief must come with clean hands. As was stated for the Supreme Court:

> * * * This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. That doctrine is rooted in the historical concept of [a] court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. This presupposes a refusal on its part to be "the abettor of iniquity." * * * Thus while "equity does not demand that its suitors shall have led blameless lives," * * * as to other matters, it does require that they shall have acted fairly * * * as to the controversy in issue. * * *
>
> * * * * * *
>
> * * * Moreover, where a suit in equity concerns the public interest as well as the private interests of the litigants this doctrine assumes even wider and more significant proportions. For if any equity court proper-

---

1. Rule 23(a), Federal Rules of Civil Procedure.

2. Rule 1, Federal Rules of Civil Procedure.

3. 28 U.S.C. §§ 1332(a), (1), (c).

4. Humphreys-Mexia Co. v. Arseneaux (1927), 116 Tex. 603, 297 S.W. 225, 53 A.L.R. 1147, 1156 (headnote 14).

ly uses the maxim to withhold its assistance in such a case it not only prevents a wrongdoer from enjoying the fruits of his transgression but averts an injury to the public. The determination of when the maxim should be applied * * * thus becomes of vital significance. * * * 5

In applying this ancient and favorite maxim in this jurisdiction, the highest court of the commonwealth of Kentucky localized it in pointed, and sometimes picturesque language, as follows:

> * * * [The maxim] is sometimes stated thus, "Whoever appeals to a court of equity for relief must do so with clean hands and with an apparently clear conscience," and again, "He that hath committed iniquity shall not have equity." The maxim, howsoever stated, proceeds upon the theory that equity has for its purpose the dispensing of unalloyed justice, and that "no polluted hand shall touch the pure fountain of justice. * * * The exclusion of a plaintiff from the peculiar favors of courts of equity results equally, * * *, where his conduct has been *unconscionable* by reason of a *bad motive*, or where the result in any degree induced by his conduct will be unconscionable, either in the benefit to himself or the injury to others. * * * (Our italics.) * * * Any willful act in regard to the matter in litigation, which would be condemned and pronounced wrongful by honest and fair-minded men will be sufficient to make the hands of the applicant unclean. * * *

> But the maxim does not * * * take cognizance of all moral infirmities, since courts of equity are not primarily engaged in the moral reformation of the individual citizen. It,

therefore, employs the maxim *only* when a litigant appeals to it for either affirmative or defensive relief through the application of sound principles of justice. In such appeals equity will scrutinize his conduct with reference to the transaction * * * and * * * if it be such as "would be condemned and pronounced wrongful by honest and fair-minded men," it will be sufficient to render the hands of the litigant unclean within the meaning of the maxim. * * * 6

■ Unconscionable conduct by reason of a bad motive connotes bad faith. "Good faith" and "bad faith" are terms, under the decisional law of Kentucky,

> * * * which ordinarily carry their own meaning. A definition of "good faith" * * * is: "An honest intention to abstain from taking any unconscientious advantage of another, even through the forms and technicalities of law, together with an absence of all information or benefit of facts which would render the transaction unconscientious." "Bad faith" is, of course, the antithesis. Though an indefinite term, it differs from and is stronger than the idea of negligence in that it contemplates a state of mind affirmatively operating with a furtive design or with some motive of self-interest or ill will, or for an ulterior purpose. * * * 7

■ Thus, here in Kentucky, now that the plaintiffs have set in motion judicial machinery to obtain affirmative equitable relief, the doors of equity will be slammed shut against them, if the claim they present is tainted by prior conduct in immediate and necessary relation to the subject at issue. This is so, however strong and clear their equitable

5. Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co. (1945), 324 U.S. 806, 814–815, 65 S.Ct. 993, 997–998, 89 L.Ed. 1381, 1386–1387 (headnotes 1, 3), rehearing denied (1945), 325 U.S. 893, 65 S.Ct. 1189, 89 L.Ed.2d 2005.

6. Dunscombe v. Amfot Oil Company (1923), 201 Ky. 290, 292–294, 256 S.W. 427, 429 (headnotes 1, 2), cited in Maas v. Maas' Admr., C.A.Ky. (1953), 255 S.W.2d 497, 498 [1].

7. Warfield Natural Gas Co. v. Allen (1933), 248 Ky. 646, 59 S.W.2d 534, 538, 91 A.L.R. 890, 896.

right against their adversaries might have been without the infirmity.[8]

It should be borne in mind that the relief sought by the plaintiff is a legal prohibition against the defendants' continued transmission of messages, stating or implying that the smoking of cigarettes will kill those persons who smoke them. " * * * Cigarettes are * * * one of the numerous manufactures of tobacco * * *." [9] For the purpose of regulating the labeling and advertising of cigarettes, the " * * * term '[c]igarette' means—(1) any roll of tobacco wrapped in paper or in any substance not containing tobacco, and (2) any roll of tobacco wrapped in any substance containing tobacco, which, because of its appearance, the type of tobacco used in the filler, or its packaging and labeling is likely to be offered to, or purchased by, consumers as a cigarette * * *." [10]

The judicial system of the commonwealth of Kentucky is among those which have widened the conception of judicial notice with the progress of the law.[11] It would be redundant for this Court to require proof, by testimony or other evidence, of facts, which can be readily and certainly verified through investigation, and which would serve only to smother this record with technicalities and result in its monstrous elongation.[12]

Therefore, this Court notices judicially that an estimated 545½ billion cigarettes were consumed in the United States in 1968; that in that year, more than 384 millions of pounds of burley tobacco were produced on over 100,000 farms in Kentucky; that, in return for something

more than $200,000,000 paid annually by cigarette advertisers, the television networks operated by the defendants transmitted throughout this nation substantial numbers of commercial announcements concerning cigarettes; and, as one example of this, during January, 1968, on the average, each inhabitant of these United States could have seen 66¾ such commercial announcements on television receiving sets.[13] These established facts permit the reasonable inference that some of the burley tobacco grown by the class, of which the plaintiffs are members, was manufactured into cigarettes, which were advertised in this manner, to induce their use or continued use by those who might smoke them. This being true, the advertisers of cigarettes are in privity, for the purposes of this lawsuit, with the plaintiffs.[14] So, the conduct of these public purveyors of cigarettes must also be scrutinized, to ascertain whether their conduct has been such as " * * * would be condemned and pronounced wrongful by honest and fair-minded men * * *."

It is of verifiable certainty that cigarette advertising over the facilities of the television networks operated by the defendants has been directed to young persons, has utilized testimonials from athletes and other celebrities who have special appeal to young people, have depicted smokers engaged in sports and other activities requiring stamina and conditioning beyond that needed for normal recreation, and have portrayed the smoking of cigarettes as essential to social prominence, success, and sexual at-

8. Shrader's Executor v. Shrader (1929), 228 Ky. 374, 15 S.W.2d 246, 66 A.L.R. 139, 142–143; Kentucky Wagon Mfg. Co. v. Ohio & M. R. Co. (1895), 98 Ky. 152, 164, 32 S.W. 595; Maas v. Maas' Admr., *supra*.

9. Austin v. Tennessee (1900), 179 U.S. 343, 346, 21 S.Ct. 132, 45 L.Ed. 224, 227.

10. 15 U.S.C. § 1332(1).

11. See Board of Education of Harrodsburg v. Bentley, C.A.Ky. (1964), 383 S.W.2d 677, 11 A.L.R.3d 990, 994 [6].

12. *Cf.* Fringer v. Venema (1964), 26 Wis. 2d 366, 132 N.W.2d 565, rehearing denied and mandate corrected (1964), 26 Wis. 2d 376a, 133 N.W.2d 809.

13. Federal Trade Commission report of 1968, pursuant to requirements of Federal Cigarette Labeling and Advertising Act, 15 U.S.C. § 1334(d) (2).

14. Kitchen v. Rayburn (1874), 19 Wall. 254, 263, 22 L.Ed. 64, 67 (headnote 1); Gables Racing Asso. v. Persky (1940), 148 Fla. 627, 6 So.2d 257.

traction.[15] Further, it was found by the Federal Trade Commission in 1964 that cigarette advertising contained two principal elements—a portrayal of the desirability of cigarette smoking and assurances of the relative safety of smoking; and in 1969 that such advertising conveyed the impression that cigarette smoking is a healthy activity, the risk of which, to the extent that any existed, can be reduced by the presence of a filter.[16] Even without noticing judicially those administrative findings, the Court can, and does, notice that since the onset of the widespread public discussion of reports relating smoking to health, a fair characterization of much cigarette advertising has been the triumphant claim for the individual brand, "ours won't hurt you as much".

The possible injurious effect of smoking cigarettes is not a new revelation. It has been general knowledge for over 400 years that respectable opinions differ as to the effects of taking tobacco into the human body. And, 70 years ago, the Supreme Court observed:

* * * Cigarettes do not seem until recently to have attracted the attention of the public as more injurious than other forms of tobacco; nor are we now prepared to take judicial notice of any special injury resulting from their use or to indorse the opinion of the supreme court of Tennessee that "they are inherently bad and bad only." At the same time we should be shutting our eyes to what is constantly passing before them were we to affect an ignorance of the fact that a belief in their deleterious effects, particularly upon young people, has become very general, and that communications are constantly finding their way into the public press denouncing their use as fraught with

great danger to the youth of both sexes. * * * [17]

Since 1954—some 16 years now—the tobacco industry itself has caused to be conducted an investigation of the relationship between health and the uses of tobacco. On January 11, 1964, the Surgeon General's Advisory Committee on Smoking and Health made the judgment that " * * * cigarette smoking is a health hazard of sufficient importance in the United States to warrant appropriate remedial action. * * * " [18] Although the Senate Committee on Commerce received testimony from 39 individual physicians who do not believe that it has been demonstrated scientifically that smoking causes lung cancer or other diseases, that committee concluded that: " * * * no prominent medical or scientific body undertaking a systematic review of the evidence has reached conclusions opposed to those of the Surgeon General's Committee. * * * " [19]

The nation has been on notice since July 27, 1965, of the declared policy of the Congress to establish a comprehensive program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health, whereby, *inter alia*, the public may be adequately informed that cigarette smoking may be hazardous to health, by inclusion of a warning to that effect on each package of cigarettes; [20] and, for two months now, the plaintiffs have been advised that, after next New Year's day, it will be criminal to advertise cigarettes by means of television transmission.[21]

Despite this plethora of information available to cigarette advertisers, which have such a compelling economic interest in the tobacco industry, these advertisers labored under no legal duty

15. S.Rep.No.91–566, 91st Cong., 2nd Sess. (1969), U.S.Code Congressional and Administrative News, p. 2660.

16. *Ibid.*, at 2656.

17. Austin v. Tennessee, *supra*, 179 U.S. at 349, 21 S.Ct. at 134, 45 L.Ed. at 228.

18. S.Rep.No.91–566, *supra*, U.S.Code Congressional and Administrative News, p. 2653.

19. *Idem.*

20. 15 U.S.C. § 1331(1).

21. Public Law 91–222, §§ 6, 9.

426

to make any statements [22] " * * * neutralizing their * * * advertising messages * * *",[23] so long as the packages of cigarettes they were offering for sale were labeled in accordance with the Cigarette Labeling and Advertising Act of 1965.[24] Obligations predicated only on high moral standards, or the humane consideration one person may have for another, are matters outside the domain of the law.

But, the concern of the Court instantly is not with the matter of lawful duties. The consideration here is that the plaintiffs supplicate this Court to enjoin further messages on national television, stating that the smoking of cigarettes will kill those who smoke them, when those in privity with them, with the clout of their massive television advertising campaigns, have never bothered to drop even a subtle hint therein that the smoking of cigarettes may be hazardous to the health of those who smoke them. The Court finds and concludes that this wilful conduct is in immediate and necessary relation to the matter advanced by the plaintiffs, and that it is so unfair it would be condemned and pronounced wrongful by honest and fair-minded men.[25] The doctrine of clean hands requires this Court to withhold from the plaintiffs its judicial assistance, not only because of such conduct, but also to avert further injury to the public,[26] by the continued retardation and erosion of public awareness of the hazards of smoking, contrary to the legislative policy of this nation. Although members of the public have information available that the smoking of cigarettes may be hazardous,

* * * [t]he mere fact that information is available, or even that it is actually heard or read, does not mean that it is effectively understood. A man who hears a hundred "yeses" for each "no," when the actual odds lie heavily the other way, cannot be realistically deemed adequately informed. * * *[27]

■ The application of this maxim of equity may appear harsh to the plaintiffs, whose contribution to the conduct faulted has consisted merely of providing burley tobacco for use in cigarettes; but, in the process of the manufacture of this tobacco into cigarettes, the plaintiffs come into a privity situation with those who advertise them, the conduct of these advertisers renders the plaintiffs' hands unclean vicariously,[28] and the plaintiffs cannot be awarded the relief they seek against the defendants.

■ The defendants have not interposed this maxim as a defense. It is not primarily a matter of defense. Anytime the uncleanness of the hands of plaintiffs, who seek affirmative judicial relief, comes to the attention of the Court, however this may have happened, the Court is required to act *sua sponte*.[29] This is not because of any regard at all for the plight of the defendants, but only on account of the public interest,[30] upon considerations that make for the advancement of right and natural justice.[31]

22. 15 U.S.C. § 1334(b).

23. Banzhaf v. F. C. C., (1968), 132 U.S. App.D.C. 14, 405 F.2d 1082, 1091, certiorari denied sub nom. Tobacco Institute, Inc. v. Federal Communications Commission (1969), 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 nos. 47, 48, 49, 51.

24. 15 U.S.C. §§ 1331–1339.

25. Dunscombe v. Amfot Oil Company, *supra.*

26. Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., supra.

27. Banzhaf v. F. C. C., *supra*, 405 F.2d at 1099.

28. See fn. 14, *supra.*

29. Frank Adam Electric Co. v. Westinghouse Elec. & Mfg. Co., C.C.A.8th (1945), 146 F.2d 165, 167–168, cited in Bishop v. Bishop, C.A.3rd (1958), 257 F.2d 495, 500(4), certiorari denied sub nom. Dreis v. Bishop (1959), 359 U.S. 914, 79 S.Ct. 578, 3 L.Ed.2d 576.

30. McMullen v. Hoffman (1899), 174 U.S. 639, 669, 19 S.Ct. 839, 851, 43 L.Ed. 1117, 1119.

31. Keystone Driller Co. v. General Excavator Co. (1933), 290 U.S. 240, 245, 54 S.Ct. 146, 78 L.Ed. 293, 297 (headnote 2).

This disposition of this litigation renders moot all outstanding motions and applications. It results also in the pre-termission of the underlying issue of great public moment, whether there is scientific evidence of any causal connection between cigarette smoking and lung cancer, cigarette smoking and heart disease, or cigarette smoking and bronchial or other respiratory disorders. All the Court is deciding is that because the claim of the plaintiffs is tainted, by prior conduct of the cigarette advertisers in immediate and necessary relation to the defendants' telecasting of messages, which state or imply that the smoking of cigarettes will kill those who smoke them, the doors of this Court are not open to the plaintiffs to contest whether they have been wronged by the defendants.

The plaintiffs hereby are denied all relief, and judgment will enter accordingly.[32]

---

**32.** Rule 58, Federal Rules of Civil Procedure.