## KITCHEN v. RAYBURN.

A., the president of a railroad company, wanting B., a farmer, to sell to him a piece of land containing about 1100 acres, and worth $10 an acre, agreed to give to B. five bonds, for $1000 each, of the company, with coupons for overdue interest, the whole principal and interest being nominally for $6000, assuring B. that the bonds and coupons were very good, that he could make the money any time out of them, and could enter 1100 acres of other land, belonging to the railroad company, full out as good as his own. B., believing what A. told him, gave up his land to A.

The representations made by A. were false. The bonds were without any market value, though when sold, sold at that time for about five cents on the dollar. The company had no lands anywhere which could be entered with the bonds, and A., the president of the railroad company, knew all this when he got B.'s land from him on the representations mentioned, and B. did not know anything about it and trusted to what A. told him.

At the same time that A. gave B. the five bonds, he gave him one hundred and nineteen other and similar bonds for $1000 each, which had $50,405 interest due upon them; and B. executed a declaration of trust under seal and in form by which he acknowledged that he had received the sum of $119,000 in bonds, and also $50,405 coupons due, in the aggregate $169,405, which sum he promised to expend in the purchase of lands from the trustees of the railroad company at a price named, taking deeds in his own name, and to sell the lands so purchased as soon as possible, at such prices as A. should direct, and after deducting expenses to pay to the wife of A. seven-eighths of all that the lands sold for.

B. not being able to purchase any lands with these bonds, sold the whole of them at about eight cents on the dollar, and retained the money.

On bill filed by A. and his wife to make B. account for the proceeds of the bonds for which he had executed the declaration of trust, B. set up that before executing it, it had been agreed between A. and himself, that if he could not get 1100 acres of lands with the $6000 bonds, that he might sell the others and retain any balance due himself out of the proceeds; and that he had made the best sale practicable. The evidence as to whether there was such an agreement was conflicting.

*Held*, that it was impossible to separate the receipt for the one hundred and nineteen bonds from the arrangement by which B. gave up his own land to A., and that this being so, A. had made such fraudulent misrepresentations to B about the value and character of the bonds that for this reason, if for no other, he could not ask the aid of equity to compel an execution of the alleged trust.

APPEAL from the Circuit Court for the District of Missouri, in which court Solomon Kitchen filed a bill against

W. C. Rayburn, charging a breach of trust in appropriating to his own use the proceeds of certain bonds put into his hands, as the bill alleged, to sell for another purpose. The case was thus:

Kitchen, president of the Cairo and Fulton Railroad Company, owning in his own right a valuable tract of land in Missouri, containing 2200 acres, and called the St. Luke lands, agreed to sell one-half of it to Rayburn, a farmer, for a price fixed on. Rayburn accordingly paid him the amount, and so became the equitable owner of the half; Kitchen giving to him a bond to make a complete title. The consideration was paid in Confederate notes, then having some market value. Both parties had been in the rebel service; Kitchen as a colonel. Having an opportunity to use the whole of the tract in paying a debt of his own, Colonel Kitchen now proposed to Rayburn to buy back the half; and in March, 1866, he passed to him bonds of the said Cairo and Fulton Railroad Company for $5000, with unpaid interest coupons, which made the amount more than $6000. At about the same time he passed to him $119,000 of other bonds, with unpaid interest coupons attached, to the amount of $50,405. Rayburn's account of this matter was thus:

"Some time in March, 1866, Kitchen told me if I would go home with him, he would place a sufficient amount of the bonds of the Cairo and Fulton Railroad Company in my hands to secure me in the price of the undivided half of the St. Luke lands, which I owned at that time, and which Kitchen wanted. I told him then that I would be at his house in a short time. During this conversation I stated to him that I knew nothing of the value of the bonds; that his words were good to me. I went to his house. He then told me he had a lot of bonds that he wanted me to enter land with; that he wanted me to enter the land in my own name, and sell it, and that he did not want his name known in the transaction, and wanted to know what I would be willing to do this for. He told me that I would have no trouble, only to examine the land and get the numbers. I I told him I thought I could do it for one-eighth of the whole amount. He then gave me five bonds to enter land in lieu of

the St. Luke lands that I had let him have. He told me that I could take those five bonds and enter the whole 1100 acres, paying all expenses, anywhere about Clarkton, Dunklin County, Missouri; and that he had a lot of bonds, over one hundred in number, that he would let me have and take my receipt for; that he wished me to enter land in my own name, in accordance with our agreement. I told him that I knew there were valuable lands around Clarkton, and he told me that those lands were railroad lands, and subject to be entered with those bonds at this time. I told him that I did not know anything about the bonds, nor the railroad land, nor the railroad company, and that I did not know whether the five bonds he had laid out for me would enter me the 1100 acres of land and pay all expenses or not. He told me they would, and if they did not, he said, 'Pay yourself out of the bonds I am going to give you, and take your receipt for.' I had confidence in what he told me to be facts that I had no means of knowing myself. I agreed to the proposition and took the five bonds. He then wrote a receipt in his wife's name for one hundred and nineteen bonds, with which I was to enter Cairo and Fulton Railroad lands in my own name, sell the lands and turn them into money, reserving one-eighth of the proceeds, after all expenses were paid, and turn him over the balance. This is the receipt:

"WILCOX, ARKANSAS, March 16th, A.D. 1866.

"Received, from Martha Kitchen, the sum of $119,000, in bonds of the Cairo and Fulton Railroad Company of Missouri, and I also received $50,405 of coupons or interest warrants due and owing by said company, amounting, in the aggregate, to the sum of $169,405, which said sum I promise to expend in the purchase of land from J. Moore, J. Wilson, and A. G. Waterman, trustees of the said Cairo and Fulton Railroad Company of Missouri, at or near the average price of $5 per acre, taking the deeds in my own name; and I further promise to sell all the lands purchased as aforesaid, as soon as possible, at such prices as the said Kitchen may direct; and if I should fail to sell all said lands as soon as said Kitchen may desire them, I promise to sell the same at public auction whenever so directed by the said Kitchen; and after deducting the expenses of stamps and the necessary travelling expenses, to pay unto the said Martha Kitchen, or her legal representatives, seven-eighths of all the money that I may sell the said lands for.

"Given under my hand and seal the date above written.

[SEAL.]                    " W. C. RAYBURN."

"Kitchen then placed in my hands maps and plats showing

the railroad lands. I then signed the receipt spoken of, made in his wife's name. He then gave me the one hundred and twenty-four bonds. I saw that they were of $1000 each, the coupons thereto attached. I then went home with the maps, plats, and bonds, and went to work hunting up the numbers of the lands in Missouri. I spent a good deal of time, trouble, and some money, and employed another man to assist me. Some-time afterwards I made inquiry of every person that I thought knew anything about these railroad lands, and I never have been able to find out how I could lay the bonds on lands. I then tried to sell the bonds and convert them into money. I found no one that would purchase up to July, 1866. I then told Kitchen that I didn't believe I could do anything with the bonds. He told me it would be only a short time then till the railroad company would be organized; and for me to continue to get up numbers of land, and be ready. He then called on me for the bond which he had given me for the undivided half of the St. Luke lands, which was my interest therein. I gave him the bond, and saw him put this bond in the fire. He then and there again assured me that the five bonds would satisfy me, and if they did not, I could use a sufficient number of the other bonds in my possession to pay myself for the undivided half of the St. Luke lands, valued at $10,000 by Kitchen him-self."

[The witness here narrated various efforts which he had made in vain to locate the bonds and to sell them.]

"I then, with the effort I had made, become very much dis-couraged, and come to the conclusion that I could not realize anything out of the bonds. I think it was some time in Decem-ber, 1866, H. H. Bedford made me an offer of $10,000 for the one hundred and twenty-four bonds. I sold them to him for that sum and he paid me the money. Before I sold these bonds to Bedford I saw a proposition made by Kitchen, stating that he was willing to take $8423 for one hundred and sixty-eight bonds. I think this was some time in August, 1866. Under these and other considerations I thought it best to sell for the $10,000. With a part of the proceeds I got for those bonds I purchased the lands from one Timberman, mentioned in the plaintiff's bill."

One Starr gave this testimony:

"I was present at a conversation when Mr. Kitchen stated to Mr. Rayburn that he would give him bonds sufficient to secure him in the sum of $10,000, upon the condition that he, Rayburn, would give up his claim or obligation on him for the St. Luke lands; and stated that with the bonds he, Rayburn, could get more land equally as good and in a better body or locality; that he would be *amply* able to secure himself for the loss, or for his surrendering his claim on the St. Luke lands, by a transfer of railroad bonds, with which he would be able to enter more and better lands. I think that the land relinquished by Rayburn was worth at least $10 per acre, then and now. After Rayburn had got some railroad bonds, he placed in my hands a lot of them to see if I could enter lands with them. I did all that I could to obtain lands for them and to ascertain what they were worth. I could not get lands for them or sell them for anything. I know that Rayburn made considerable inquiry and went to great trouble about getting lands for the bonds, and I know that he was offering to sell them. I do not know of any offer being made to him for the bonds until I learned that he had sold them to Bedford, for the sum of $10,000. I then thought and still think it was the best that Rayburn could have done. I know that he went to great trouble in getting up the numbers of lands, and in trying to get lands for the bonds which he held, and was not able to do it."

Some considerable time after this sale the railroad company was organized; the prospects of its success improved; and Bedford, to whom Rayburn sold the bonds for $10,000, sold them for $26,300.

Kitchen's account of the matter was that the land, though it had been worth $10 an acre before the Rebellion, was not worth that sum when Rayburn agreed to retransfer it to him; not worth more than $5; and that the *five* bonds of the Cairo and Fulton Railroad Company, with the coupons with arrears of interest, were the payment for it on the retransfer, the amount above $5000 being added, in case the trustees of the railroad company should charge Rayburn more than $5 an acre for *their* lands; that the remaining one hundred and nineteen bonds were put in Rayburn's hands

for the exact purpose stated in Rayburn's receipt, and for no other purpose.

At the time when these transfers took place, and when this receipt was given, the Cairo and Fulton Railroad was insolvent. There was no fixed market for its bonds; but when sold they would bring about five cents on the dollar. Kitchen, in settling with the company a claim which he had against them, took the bonds which he transferred to Rayburn at about that price. Neither the company, nor Moore, Wilson, or Waterman, the trustees of the company, had any lands open to purchase through the surrender of bonds.

Rayburn not being able to use his bonds in the way in which Kitchen had told him that they could be used, Kitchen sent a young man named Carter with a letter in the shape of an order to deliver up to Carter the one hundred and nineteen bonds mentioned in the receipt. But Rayburn had in the meantime sold the bonds. He soon afterwards wrote this letter to Kitchen:

"PRAIRIE CITY, STODDARD COUNTY, MISSOURI,
"February 8th, 1867.
"COLONEL KITCHEN.

"DEAR SIR: I received your note a few days ago, and should have *wrote* to you before, but was on my way to Cape Girardeau. Colonel, *I may have done rong*, but if I have I thought it was the best that could be done, and I hope you will be satisfied. I have sold the bonds. D. B. Miller advised me to sell. He sold, and everybody else that had bonds, I think. The hole number of bonds that went from Bloomfield was something over $800,000. I agreed to take whatever they got, and I only got $10,000, or am to get by the first of April next. *I ought to have went to see you before I sold*, but hope you will be satisfied. I will write again soon. Let me hare from you.

"W. C. RAYBURN."

In 1870 Kitchen and wife filed a bill against Rayburn and others, claiming the proceeds of these bonds, now alleged to have passed into certain real estate. The bill set out that the bonds had been given to Rayburn in trust, as the receipt showed; that in breach of his trust he had sold them and

vested the proceeds in lands. The answer gave the history of the transaction as given in Rayburn's statement above.

The court below dismissed the bill, and the complainants brought the case here.

*Messrs. J. M. Carlisle and J. D. McPherson for them* relied on the declaration of trust signed by Rayburn, and which they contended the court ought not to suffer to be weakened by parol testimony, and especially not by his own parol testimony. It was certain that he had received other bonds, and it was not to be doubted that *those* were the bonds that were the equivalent for the moiety of the St. Luke property originally bought for Confederate money, at what value did not appear, and on a retransfer of which the $6000 debt due by the railroad company was, probably, a sufficient compensation.

Then Rayburn's own letter came in confirmation. He admits that he may have done wrong, and that he ought to have gone to see Kitchen before selling as he did.

The fact that the bonds were worth but five cents on the dollar would be important if Kitchen were seeking to charge Rayburn with some higher sum than the admitted proceeds; but as he is only seeking to charge Rayburn with such admitted proceeds, their small market value in comparison with their "face value" has nothing to do with the matter. Rayburn got about eight cents, and he is asked to account for no more.

*Messrs. Montgomery Blair, T. T. Gantt, and F. A. Dick, contra.*

Mr. Justice STRONG delivered the opinion of the court.

It is impossible to separate the receipt which Rayburn gave for the one hundred and nineteen bonds from the arrangement by which he gave up his title to the moiety of the St. Luke lands, and the engagement of Kitchen to secure to him $10,000, the understood value of the lands. They are all parts of one transaction. The assent of Rayburn to a rescission of the contract by which he had become the equitable owner of that moiety, the acceptance of some of the bonds

as security for payment of the consideration for the surrender, and the undertaking to invest the remaining bonds in the purchase of land from the trustees of the railroad company, were all induced by the representations of Kitchen, and they were obtained at the same time. The evidence satisfactorily establishes that, having sold an undivided half of the St. Luke lands to Rayburn, and subsequently finding it for his interest to recover the ownership of them, he proposed a repurchase. There appears to have been no difference of opinion respecting the value of the lands and the price to be paid for the proposed surrender of Rayburn's title. Starr, a witness present when the arrangement was spoken of, testifies that Kitchen stated to Rayburn he would give him railroad bonds sufficient to secure him in the sum of $10,000 if he would give up his claim or obligation on him for the lands, and further stated that with the bonds he, Rayburn, could get more land equally good and in a better body or locality. The St. Luke body of lands contained twenty-two hundred acres, of which a moiety had previously been sold by Kitchen to Rayburn, and this witness thought they were worth at least $10 an acre then, that is, when the arrangement was made for the repurchase. To the same effect is the testimony of Rayburn himself. It is that the undivided half of the St. Luke lands were valued by Kitchen at $10,000, and there is no evidence in the case inconsistent with this. Ten thousand dollars, then, was the sum which Kitchen came under obligation to pay to Rayburn for the lands which the latter surrendered by giving up the receipt he had taken for the purchase-money, and by returning the property bond.

Thus far there is little conflict in the evidence. But from this point onward there is more disagreement. The account of the transaction given by Kitchen is that he agreed to give Rayburn, in satisfaction of the debt, railroad bonds of the Cairo and Fulton Railroad Company, enough to pay for a thousand acres of land of the company, then held by trustees, and that he did give him five such bonds for $1000, each amounting with the interest coupons thereon to more than

$6000, telling him the trustees might charge him for the land a little more than $5000, but that he would make it up. The remaining bonds, he states, were taken by Rayburn to be invested in lands for Mrs. Kitchen. He does not admit that he authorized the application of any of those remaining bonds to the payment of his debt to Rayburn.

The testimony of Rayburn is that Kitchen not only gave him the five bonds towards the liquidation of the debt, but that he also said if they were not sufficient, he (Rayburn) might use a sufficient number of the others in his possession (meaning those for which the receipt was given) to pay himself for the undivided half of the St. Luke lands, valued at $10,000 by Kitchen himself. If this is true there is an end of the plaintiff's case, for it clearly appears that the bonds could not be used in the entry or purchase of the railroad company's lands, and that the whole of them, one hundred and twenty-four in number, were sold for $10,000, a sum not greater than the agreed value of the St. Luke lands. The plaintiff's bill affirms that sale, and it seeks to follow the proceeds subsequently invested, in part, in the land bought from Timberman.

It is not necessary, however, to determine whether the testimony of Rayburn in this particular is a true account of the transaction. There is another aspect of the case which is controlling. The arrangement between Kitchen and Rayburn, in which the latter surrendered his claim to the St. Luke lands, accepted bonds in payment of the debt due him, and assumed a trust of other bonds, even if it was such as the plaintiffs allege, was fraudulently obtained by Kitchen. He had been president of the railroad company. He knew its condition. He knew that the bonds were almost valueless. He had declared that under certain circumstances they would not be worth more than five cents on the dollar. Having himself a claim upon the company, he had refused to receive the company's bonds in liquidation of the claim at more than $50 each, including unpaid coupons, and he had settled with the company, receiving one hundred and sixty-eight bonds at that rate. Yet, in order to effect his

bargain with Rayburn, who was an illiterate man, he represented to him that the bonds were very good; that he (Rayburn) could make the money at any time out of them; that he could enter eleven hundred acres anywhere about Clark ton, Dunklin County, with five of them, paying all expenses; that the lands about Clarkton, known to Rayburn, were railroad lands, and subject to be entered with those bonds at that time. All these representations were false, and were known by Kitchen to be false. Moreover, he was assured that Rayburn had no knowledge upon the subject, and that confidence was reposed upon his statements. It was thus the contracts were obtained. Rayburn gave up his bond for the conveyance of the St. Luke lands, accepted the bonds, and assumed the trust. And it was not until after he had discovered that neither the trustees of the railroad company nor the company itself had any lands about Clarkton, or elsewhere, that could be entered with the bonds, either at five dollars per acre or at any price, that the bonds were almost valueless, and that Kitchen had offered to sell one hundred and sixty-eight similar bonds for $8423, that he sold those transferred and deposited with him for $10,000.

The complainants, then, do not come into court with clean hands. They are seeking the benefit of a contract obtained by their fraud, or by the fraud of Kitchen. Hence they can have no standing in a court of equity. Such a court will not lend its power to assist or protect a fraud. It will not even enforce an unconscionable bargain. In *Bein* v. *Heath*[*] it was said to be a principle in chancery " that he who asks relief must have acted in good faith. The equitable powers of this court can never be exerted in behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage. To aid a party in such a case would make this court the abettor of iniquity." For this reason, if for no other, the plaintiffs cannot succeed. They are seeking in a court of equity to derive an advantage from their own wrong.

DECREE AFFIRMED.

* 6 Howard, 247.