## FORD et al. v. BUFFALO EAGLE COLLIERY CO. et al.

### No. 4728.

Circuit Court of Appeals, Fourth Circuit.

Sept. 10, 1941.

Before SOPER, DOBIE, and NORTH-COTT, Circuit Judges.

Walter L. Brown, of Huntington, W. Va. (C. W. Strickling, Jackson N. Huddleston, and Fitzpatrick, Brown & Davis, all of Huntington, W. Va., on the brief), for appellants.

E. L. Hogsett, of Huntington, W. Va. (J. W. St. Clair and Hogsett, St. Clair & Greene, all of Huntington, W. Va., on the brief), for appellees.

DOBIE, Circuit Judge.

James H. Ford, Leroy Allebach, Gideon S. Borden, and Robert Mankin, all appellants herein, are the holders of certain notes executed by the Buffalo Eagle Colliery Company (hereinafter called Colliery Company) and secured by a deed of trust covering all the property and assets of the Colliery Company. After appellants' deed of trust was both executed and recorded, the Collector of Internal Revenue seized the assets of the Colliery Company and sold them in satisfaction of the federal income taxes assessed against this company. The property was purchased, at a sale under distraint for the income taxes, by Joseph Lemkuhl, one of the appellees herein, who purported to purchase the property for himself, but who, in reality, purchased the property for the sole stockholders of the Colliery Company, i. e., P. J. Riley, Catherine B. Riley, and John R. Simpson, all appellees herein. Subsequent to Lemkuhl's purchase of the aforementioned

property, the Rileys and Simpson formed the Buffalo Eagle Mines Incorporated (hereinafter called the B. E. Mines), another appellee herein. Lemkuhl executed a deed conveying all the purchased property to the B. E. Mines in consideration of the issuance to him of 1,995 shares of its stock. He, then, delivered this stock of the B. E. Mines to the Rileys and Simpson, and, in this delivery, he also included a power of attorney for the transfer of the stock to their names.

Appellants originally instituted this action in the United States District Court for the Southern District of West Virginia for the general purpose of (1) setting aside the aforesaid transactions as against them, (2) having the aforementioned deed of trust adjudicated a lien upon the property in the possession of the B. E. Mines, and (3) enforcing the deed of trust in accordance with its terms. J. Cary Alderson, the trustee under the deed of trust, and all the aforementioned appellees were joined as party defendants. Among other things, appellants maintained that, under section 3697(b) of the Internal Revenue Code, appellees acquired the title to the Colliery Company property subject to appellants' deed of trust; that, under section 3693(b) or section 3701(b) of the Internal Revenue Code, the sale of the property was invalid for lack of sufficient public notice. As the amount in controversy allegedly exceeded $3,000, the jurisdiction of the District Court was invoked on the grounds that a federal question was involved, namely, an interpretation of the provisions of the Internal Revenue Code. Cf. St. Paul, M. & M. R. R. v. St. Paul & N. P. R. R., 8 Cir., 1895, 68 F. 2, 14, discussed in Dobie on Federal Procedure (1928) § 60, p. 173.

After hearing all the evidence, Judge McClintic made his specific findings of fact and then concluded that, as an equitable remedy was here being sought, appellants were (1) barred by laches and, (2) because of certain fraudulent acts committed by them, barred by the equitable doctrine of "clean hands". We have carefully scanned the instant record and we are of the opinion that there is ample evidence to support Judge McClintic's findings of fact; and that, at all events, these findings of fact are not clearly erroneous. See Wolf Mineral Process Corp. v. Mineral Separations N. A. Corp., 4 Cir., 1927, 18 F.2d 483, 486. Also, cf. United States v. Still, 4 Cir., 120 F.2d 876, decided by this court on June 10, 1941; Kuhn v. Princess Lida of Thurn & Taxis, 3 Cir., 1941, 119 F.2d 704, 705, 706. We have concluded that the District Judge did not abuse his discretion in applying the fundamental equitable maxim that "He who comes into equity must come with clean hands." See Keystone Driller Co. v. General Excavator Co., 1933, 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293. Therefore, we find it unnecessary to discuss any of the other issues raised by appellants on this appeal, and we will consider the facts of this case only in the light of the single issue of clean hands.

In 1914, the Colliery Company, a West Virginia corporation, acquired a coal mining lease of 740 acres near Braeholm Post Office in Logan County, West Virginia, installed a mining plant thereon, and began mining operations. After many years of successful operation, this corporation was confronted with a critical federal income tax problem. On October 3, 1925, the company had been assessed with additional income taxes for the year 1917, in the amount of $13,753.65; on January 6, 1926, with additional taxes for 1918, in the amount of $66,192.95; and on January 7, 1926, with additional taxes for 1919, in the amount of $2,246.50. Notices of liens for these taxes had been filed with the Clerk of the United States District Court for the Southern District of West Virginia on December 16, 1925, as to 1917 taxes; and on May 29, 1926, as to 1918 and 1919 taxes. On December 31, 1926, the company had been assessed with additional taxes for 1920, in the amount of $23,530.49; and on February 4, 1927, with additional taxes of $1,611.02 for the year 1922. An appeal was taken from the assessment applicable to 1920 to the Board of Tax Appeals.

The date of July 30, 1927, is of great importance in the consideration of the facts of this controversy; inasmuch as, on that date, one group of Colliery Company stockholders (hereinafter called the Riley group) approved the Colliery Company's purchase of the stock of another group of Colliery Company stockholders (hereinafter called the Ford group), which purchase included a contractual settlement of all unpaid taxes. Some two years prior to this controlling date, the Colliery Company had appointed a tax committee to adjust and settle the taxes. This committee was made up of two men—Leroy Allebach, Secretary and Attorney for the Colliery Company; and James H. Ford, treasurer and superintend-

ent of the Colliery Company, a bookkeeper and an auditor who had had approximately twenty-five years of experience in the coal business. Upon the recommendation of an employee of the United States Internal Revenue Department (hereinafter called the Department), Allebach employed E. S. Sites, himself a former employee of the Department. Ford and Allebach, under the direction of the tax expert, Sites, entered into extended negotiations with the Department for the settlement of the accumulated and unpaid income tax assessments which had been made against the Colliery Company. The form and extent of these negotiations will be discussed below.

Sometime prior to the sale and purchase of the Colliery Company stock on July 30, 1927, dissension arose among the seven stockholders and they, consequently, split into two factions. One faction, the Riley group, was composed of P. J. Riley, the nominal President of the Colliery Company; Catherine B. Riley, the wife of P. J. Riley; and John R. Simpson. The other faction, the Ford group, was composed of Ford, Allebach, G. S. Borden and Robert Mankin. On July 18, 1927, the Ford group presented a "buy or sell" offer to the Riley group, under which one group or the other would sell their stock to the Colliery Company at $700 per share, one-fourth cash and the balance in fifty monthly payments, secured by a deed of trust on all the company's property, the company to assume all unpaid taxes, and the sellers to cooperate with the buyer to the fullest extent in settling any disputed taxes.

Upon receipt of the buy or sell offer, P. J. Riley asked Ford about the taxes; and Ford merely stated that part of the taxes were "outlawed". P. J. Riley was an old man who had but little formal education. He understood the practical operations of the coal business but knew almost nothing about tax matters. All tax matters had been left in the hands of Ford and Allebach. Although P. J. Riley knew that Sites had been hired, and though P. J. Riley had given Sites a power of attorney to handle all tax matters, Riley had never met Sites until long after the purchase of the Colliery Company stock. He, therefore, wrote to Allebach asking specifically what "years and amounts" had been "outlawed" and what "years and amounts" were "still outstanding to be adjusted". In a letter dated July 22, 1927, Allebach replied that he had spoken to Sites and that he had the following to report: the tax claim of the govern-

ment for 1917 through 1919, totalling $89,-333, was "settled and out of the way"; the government claim for 1922 of $6,406.28 had been settled for $1,326.70 and was "paid and * * * out of the way"; the government claim for 1920 of $23,530.49 would be settled for either $12,140.24 or $11,390.25. Allebach concluded his letter with the statement: "I am therefore able to report that the taxes have all been settled except for the year 1920 and these are in the process of settlement."

The District Judge found that it was in reliance upon Allebach's letter that the Riley group elected for the company to buy the stock of the Ford group. In view of the "cordial and intimate" relationship that existed between Allebach and Riley, there is adequate evidence to support this finding. It must be remembered that Allebach was the attorney for the Colliery Company and that the Riley group, all of whom were incompetent by education or experience to handle the tax matters, had left the negotiations with the Department in the hands of Ford and Allebach.

To close the deal, a meeting of the board of directors was held on July 30, 1927. All seven stockholders, as directors, were present. Ford and Allebach, as the company's tax committee, reported that they had spent something over $7,000 to date on tax matters; and that something over $8,000 would be necessary "to complete all outstanding settlements and expenses incurred." The treasurer was directed to issue a voucher in favor of "E. S. Sites, Attorney", in "the amount required to finish paying the taxes in full and the expenses for attorney's fees, etc." Following this report, the company purchased the stock of the Ford group under the buy or sell offer. Ford and Allebach agreed to continue to act as the "tax committee" of the company until all the taxes were finally settled.

The District Judge concluded that Ford and Allebach were guilty of fraud in the sale of the Ford group stock to the Colliery Company. He found that "None of the taxes were settled and none of the taxes were barred by the statute of limitations." We are of the opinion that there is sufficient evidence to support this finding and that, under the applicable West Virginia law, Ford and Allebach had committed a fraud in the sale of this stock. Cf. Horton v. Tyree, 1927, 104 W.Va. 238, 139 S.E. 737, followed in Gall v. Cowell, 1937, 118 W.Va. 263, 190 S.E. 130, 139.

Ford, as the treasurer of the Colliery Company and member of the tax committee, and as a former bookkeeper and auditor, knew more about the tax situation than any of the other stockholders and directors in the Colliery Company. He had worked in close relationship with Sites and with Sites' predecessor, one Lemasters. Prior to August 1, 1927, there was not a single company check written in connection with income taxes that had not been signed by Ford. On cross-examination, Ford admitted that Sites was required to explain the use made of every check demanded; that Sites reported to Ford whenever he wanted a check for income tax purposes. Ford had made sundry trips to Washington all in reference to the tax problem. Two days before the meeting of July 30, 1927, he had written a check for $6,700 for "expense in connection with income tax matters". This check covered the expenses he had incurred on a Washington trip.

Allebach, as the secretary of the Colliery Company and member of the tax committee, and as a lawyer, was also well-informed as to the tax situation. He had made a trip to Washington with Lemasters, and one with Sites, in reference to the taxes in question. After speaking to a revenue agent in Huntington, West Virginia, Allebach had hired Sites. Allebach knew that large amounts of taxes had been assessed and, also, that three attempts had been made to settle these taxes by offers of compromise. Furthermore, he had affixed the seal of the corporation to at least four of the five waivers that the corporation had made in reference to the running of the statute of limitations.

In its initial attempts to compromise the taxes assessed for 1917, 1918, and 1919, the tax committee had made two offers of compromise to ·the Department. Both had been rejected. On November 16, 1926, two checks, one of $20,000 payable to the Collector of Internal Revenue, and one of $5,000 payable to E. S. Sites, were written at the direction of Ford and were signed by him as treasurer. The $20,000 check was used as the third offer of compromise. Joseph Crigger, a Deputy Collector of Internal Revenue, testified that this offer had been rejected; that he had returned the check for $20,000 to Ford between the 15th and 20th days of July, 1927; and that, at the direction of his superior, he had asked Ford to endorse the check and return it to the Government to apply on the tax liabilities for the years in question,

1917 through 1919. Ford refused to apply the check to the full assessment and, accordingly, the check was returned to him. On July 31, 1927, the day after the stock sale, and the day after Ford and Allebach had reported that only $7,000 had been spent on tax matters and that only about $8,000 would be necessary to complete all outstanding settlements and expenses, Ford returned this check to the company-bookkeeper, D. E. Hensley.

In testifying as to the receipt of the $20,000 check, Hensley stated: "He (Ford) said this money was being used through Mr. Sites and some fellows on the inside to pay these boys for the waivers that they had signed and to get them out of the possession of the government. He told me on more than one occasion. At this particular time I asked him why he did not produce those waivers and he said they had been burned in the presence of him and Mr. Sites."

Hensley further testified that Ford had stated that P. J. Riley had not been told about the use of this money because Riley "did not believe in that sort of thing." Ford denied having had this conversation with Hensley. Allebach denied that he had any knowledge or intimation "that any amount being paid to Sites was being used to influence any government officer or employee, or for any improper purposes". At all events, no explanation was offered by any one as to what happened to the $5,-000 check which had been given to Sites on November 16, 1926.

On cross-examination, Ford's testimony was very unsatisfactory. Part of this cross-examination follows:

"Q. How did you think Sites had settled these taxes if in November you gave him a check for $20,000 as a compromise and then that check came back? A. It did not come back to me.

"Q. Don't you know as a fact it was turned back in July? A. The records will show that.

"Q. How did you think Sites had settled the taxes if the money put out for that purpose had come back? A. I do not think we received the money at that time.

"Q. Is that the only answer you care to make to that question? A. Yes, sir.

"Q. You still insist you ·thought the taxes had been settled? A. So far as I knew, relying on Sites' word, yes, sir.

"Q. Did you not know then that there was an appeal pending before the Board of Tax Appeals for the 1920 taxes? A. I may have been advised; I do not remember.

"Q. How did you think that had been settled? A. I suppose Sites settled it.

"Q. Where did you think he would get the money? A. I supposed he would call on us. I supposed the $20,000 would settle it.

"Q. And that is the only answer you care to make to that? A. Yes, sir. If the money came back it was immediately redeposited, and the records will show when it was deposited."

On redirect examination of Ford, counsel for appellants introduced a carbon copy of a letter from Sites to Ford dated May 2, 1927. The original letter was missing. This copy stated, inter alia: "I am going to Washington end of this week to work on the 1920 tax before the Office of General Counsel. For the years 1917, 1918 and 1919 the decision of the Supreme Court applicable to those years, was approved by the Secretary of the Treasury and Mr. Blair, the Commissioner on April 4, 1927. This settles these years without a question, and I will now endeavor to have the $20,000.00 returned. However, the Department may desire this to be applied on the tax for 1920 and 1922, which, of course is too much as a compromise."

Ford was then subjected to the following redirect examination:

"Q. Did you know anything about the decision of the Supreme Court of the United States mentioned in that letter? A. I did not.

"Q. There were some waivers put in the morning that seem to have been signed by you. Did you know anything about the effect of waivers on income tax laws? A. I did not.

"Q. Upon whom did you rely as to those matters? A. On Mr. Sites."

On cross-examination, Allebach offered the following testimony in support of Ford's redirect testimony:

"Q. You knew that one or two offers of compromise had been made in an effort to settle those taxes? A. The report of Sites on the last one, as I remember, made an offer of $12,000 or $14,000. That was rejected. Later we raised the offer to $20,000 or $25,000. Sites reported to us that on account of a decision of the Supreme Court of the United States 'These taxes are outlawed (or something to that effect) and I think we will be able to get back that $20,000.' It developed in your examination of Mr. Ford yesterday that the money had been returned.

"Q. Mr. Ford did not tell you on July 30, 1927, that the $20,000 had been returned a few days prior to that time by a deputy collector who had been advised by him that the offers were rejected and that the taxes would have to be paid, or words to that effect? A. No, sir.

"Q. When you sat in the meeting of July 30, 1927, with Mr. Ford and these other gentlemen, you were ignorant of that fact? A. I was, sir; for which fact I am very sorry."

The Supreme Court decision referred to by Sites, Ford, and Allebach is Bowers v. New York & Albany Lighterage Co., 1927, 273 U.S. 346, 47 S.Ct. 389, 71 L.Ed. 676. The substance of the holding of this case is that the running of the statute of limitations will bar a distraint, as well as a judicial, proceeding for the collection of assessed taxes. However, how could Allebach, a competent attorney, have believed that the statute of limitations had run when he knew that waivers had been signed by Colliery Company? Had he not affixed the corporate seal to at least four of the five waivers? Certainly the well-informed Sites must have understood the effect of these waivers. Also, it is very difficult to accept Ford's testimony that he did not understand the effect of the waivers.

In their brief, appellees state: "We submit that Allebach and Ford * * * were guilty of fraud in dealing with the government about taxes in that they tried and evidently thought they had secured the destruction of all waivers * * *." Throughout the record there are additional allusions to the fraud that was attempted in the dealings with the Government. There is the testimony of Hensley that Ford had told him on more than one occasion that money was being used through Sites to pay "some fellows on the inside" for the waivers. This testimony seems to be buttressed by the testimony of Judge Charles L. Estep, secretary and attorney for the B. E. Mines, to the effect that Ford had specifically stated in reference to the waiver question:

"He (Ford) told me that he had signed none and that, as far as he knew, none had been signed on behalf of the company

further than some of the employees in the income tax department intimated to him that they held a letter or some paper signed by Mr. P. J. Riley that amounted to a waiver. He expressed doubt as to whether they had such a paper or whether it constituted a waiver. * * *"

Ford testified on direct examination in rebuttal that if he had said the foregoing to Judge Estep it was "a slip or a mistake." Furthermore, there is the letter written by Allebach to Judge Estep on January 7, 1928, wherein Allebach stated: "There are some angles to this matter with which you are not familiar, and with which Mr. Ford and I are very familiar. I suggest that sometime at your convenience and at the convenience of Mr. Ford we three meet in Huntington alone and go over the matter in the hope of settling it amicably without recourse to the court, a proceeding which we will all deplore."

Allebach testified on cross-examination that he was referring to the "internecine strife which existed for a number of years"; that he was going to tell Judge Estep about the difficulty he had in attempting to "reconcile these warring factions."

All in all, there is strong evidence to support the inference that a fraud had been attempted on the Government in reference to the Colliery Company's tax obligations. In view of Ford's close association with Sites and of his close check on Sites' activities, and in view of Allebach's position on the tax committee and his knowledge of legal matters, we believe that both Ford and Allebach were, at least, guilty of fraud in the sale of the stock of the Ford group to the Colliery Company on July 30, 1927. It should be noted that on July 30, 1927, the time of the sale of the Ford group stock and the time of the report of the tax committee made by Ford and Allebach, an appeal was pending before the Board of Tax Appeals as to the assessment of $23,530.49 for the year 1920. Some reference had been made to the 1920 taxes in the letter from Allebach to P. J. Riley, dated July 22, 1927; yet, on July 30th, nothing was said about 1920 taxes. The tax committee reported that approximately $8,000 would complete all outstanding settlements and expenses; yet, Ford and Allebach knew that the 1920 taxes could at best be settled for either $12,140.24 or $11,390.25. True, P. J. Riley had been informed in the letter of July 22nd as to the amount of the probable settlement of the 1920 taxes. But,

when on July 30th it was reported that $7,000 had been spent and that approximately $8,000 was to be spent, this final report would seem to supersede any inconsistent statements in Allebach's letter.

The controlling West Virginia rule on the question of fraud is stated in the syllabus prepared by the court in Horton v. Tyree, supra, 104 W.Va. 238, 139 S.E. 737: "Where one person induces another to enter into a contract by false representations, which he is in a situation to know, and which it is his duty to know, are untrue, he, in contemplation of law, does know the statements to be untrue, and, consequently, they are held to be fraudulent, and the person injured has a remedy for the loss sustained by an action for damages. It is not indispensable to a recovery that the defendant actually knew them to be false."

Speaking for the Supreme Court of Appeals of West Virginia in this case, Judge Woods added (104 W.Va. 238, 139 S.E. at page 738): "A representation in respect to a matter, with the intent to influence the conduct of another, implies necessarily the belief of the party making it that the statement is true. If the fact be within his means of knowledge, and he have no knowledge of the fact, a jury would be authorized to believe that the statement was knowingly false. The question of whether the defendant should know the falsity of his representations was squarely met in Osborne v. Holt [92 W.Va. 410, 114 S.E. 801] * * *. It was there held that one who represents that a certain condition exists with the expectation that another will act thereon, when in fact he has no knowledge and regard thereto, will be as liable to another who deals with him on the basis of such representation, should it turn out to be false, as though he knew of the falsity thereof at the time it was made. 'He is under a duty to know,' said the court, 'that the things he represents as facts are in fact true at the time he makes the representation. It is no excuse for him to say that he did not know they were false,' citing in support thereof the decided cases of Stout v. Martin, 87 W.Va. 1, 104 S.E. 157; James v. Piggott, 70 W.Va. 435, 74 S.E. 667; Tolley v. Poteet, 62 W.Va. 231, 57 S.E. 811; Crislip v. Cain, 19 W.Va. 438."

We believe that our conclusions on the issue of fraud become even more evident when viewed against the background of

some of the facts which occurred subsequent to July 30, 1927. On August 1, 1927, Sites wrote P. J. Riley stating that he required $1,611.02 to settle the 1922 taxes and $7,000 to settle the 1920 taxes. Checks for these amounts were promptly forwarded to Sites, the check for $7,000 being executed on behalf of the Colliery Company by P. J. Riley, President, and being payable to the order of "E. S. Sites, Attorney". On August 24, 1927, Sites again wrote the Colliery Company stating this time that his Washington representative advised that $7,500 additional was needed for the settlement of the 1920 taxes. On October 8, 1927, Ford, Sites, Simpson and Judge Estep held a conference, at which time Sites and Ford assured Simpson and Judge Estep that the 1917, 1918, and 1919 taxes were not collectible. As stated above, Judge Estep testified that, at this meeting, Ford had assured him that no waivers had been signed. Later, Allebach, Ford and Sites held a meeting in Charleston, West Virginia, in reference to the request for $7,500. Reporting on this meeting, Ford wrote to P. J. Riley's son, J. S. Riley, and stated that they had all agreed "that the best policy to pursue would be to follow out Sites' view in this matter, which he informs me will clear up your tax matter." In a letter of November 14, 1927, Allebach wrote substantially the same thing to P. J. Riley. Finally, on November 30, 1927, a check for $7,500 was executed to "E. S. Sites, Attorney."

Hence, though the Colliery Company had agreed to pay something over $8,000 to close all settlements and expenses, it actually paid a total of $16,360.83—on August 1, 1927, $1,611.02 and $7,000; on November 30, 1927, $7,500; and, in 1928, by direct payment to the Government, $249.81. The check for $7,500 and the check for $7,000 were both made payable to Sites and were both cashed by him; but it does not appear from the record what disposition he made of the funds. Thus, at the direction of Allebach and Ford, the Colliery Company had given Sites a total of $16,111.02. Of this, Sites had paid the Government $1,376.70, leaving unaccounted for the sum of $14,734.32. The $5,000 check that Ford had issued to Sites in November, 1926, is also unaccounted for.

In August and September, 1927, the Government made demands on the Colliery Company for the payment of the taxes for 1917, 1918, and 1919. The record amply evidences the difficulties that appellees en-

countered in securing a conference with Sites, Allebach and Ford, and the lack of cooperation given by the "tax committee" of Ford and Allebach. In November, 1928, a deputy collector appeared at the mine with a distraint warrant and agreed to wait three weeks before the levy. Judge Estep notified Ford and Allebach of the impending distraint on the 4th, 11th and 17th of December, 1928. Although he told them of the imperative necessity for action, they neither met with Judge Estep nor did anything to settle the Colliery Company's problem. On January 7, 1929, distraint warrants for $111,677.86 for 1917, 1918, and 1919 taxes were levied on the company's property. The sale was advertised by a notice posted at Braeholm, the Colliery Company's post office, and at two other public places in Logan County. And, finally, on January 21, 1929, the property was sold to Joseph Lemkuhl, acting for the Rileys and Simpson, for $31,000 cash.

Although all the property of the Colliery Company was ultimately conveyed to the B. E. Mines, and although they no longer possessed any stock, the appellants, on March 18, 1929, held what purported to be a meeting of stockholders of the Colliery Company. They elected themselves directors and, as directors, elected themselves officers. In the name of the alleged corporation, a communication was sent to the Government protesting the illegality of the distraint sale. In a letter dated October 19, 1929, the Commissioner of Internal Revenue answered that the distraint sale had been investigated and that the investigating officer had found that the sale had been conducted in accordance to law.

The Colliery Company property had been sold on January 21, 1929, and appellants first learned of the sale a few days thereafter. Yet, this suit was not instituted until July 3, 1931, two years and five months after appellants learned of the sale. During that period of time, P. J. Riley had used his credit to keep the B. E. Mines in operation. He has also rendered valuable services without any compensation. His wife has placed $10,000 in additional money into the B. E. Mines.

■ Inasmuch as we have concluded that Ford and Allebach had committed a fraud in the sale of the Ford group stock to the Colliery Company on July 30, 1927 (cf. Horton v. Tyree, supra) we are of the opinion that the District Judge properly exercised his discretion in applying the

equitable maxim of clean hands. Appellants herein were essentially requesting an equitable remedy: the setting aside of the distraint sale and the enforcement of their deed of trust. Before passing upon the merits of appellants' contentions, the District Judge had before him the fundamental proposition that "He who comes into equity must come with clean hands." And, here, appellants were seeking to enforce a right which had grown out of a fraudulent transaction. Cf. Bias v. Bias, 1937, 109 W.Va. 621, 155 S.E. 898, 899.

In the syllabus written by the Supreme Court of Appeals of West Virginia in the case of Craig v. Craig, 1903, 54 W.Va. 183, 46 S.E. 371, it is stated: "If the case made by a party seeking the aid of a court of equity is tainted with fraud on his part, it will not aid him."

This is but one, of many instances, in which the West Virginia Supreme Court of Appeals has recognized the application of the clean-hands doctrine. E. g., Wood v. Snodgrass, 1935, 116 W.Va. 538, 182 S.E. 286, 288; Hall v. Hall, 1911, 69 W.Va. 175, 71 S.E. 103, 104, 34 L.R.A.,N.S., 758; Bates v. Swiger, 1895, 40 W.Va. 420, 21 S.E. 874, 877, 878. In Miller Todd Coal Co. v. Adrian Fuel Co., W.Va.1939, 1 S.E. 2d 873, 875, Judge Maxwell recently restated the West Virginia rule as follows:

"The clean-hands maxim is sometimes thus stated: 'He that hath committed iniquity shall not have equity.' Iniquity involves absence of, or deviation from, just dealing. It negatives the existence of uprightness, and means that there has been substituted therefor gross injustice, wickedness. Where a litigant's conduct can properly be thus characterized, it is termed unconscionable and, if such conduct has transpired in connection with the immediate subject matter of the suit, equity will close its doors against the party thus tainted. It is said on high authority that any really unconscientious conduct, connected with the immediate controversy, will repel the suitor. 1 Pomeroy's Equity Jur., section 404."

True it is that all the appellants have not been found guilty of fraud in the sale of their stock to the Colliery Company. But the bar of the clean-hands maxim is not employed for the punishment of wrongdoers; rather, it is introduced to protect the court of equity and the party defendant from having the powers of the court used in bringing about an inequitable result in the particular litigation before it. See Smith v. Ajax Pipe Line Co., 8 Cir., 1937, 87 F.2d 567, 568, certiorari denied, 1937, 300 U.S. 677, 57 S.Ct. 670, 81 L.Ed. 882. Thus, the appellants, though all are not guilty of unconscionable conduct, cannot here claim the benefit of a fraud perpetrated by one or two of their number. Cf. Kitchen v. Rayburn, 1873, 19 Wall. 254, 86 U.S. 254, 263, 22 L.Ed. 64; also, Keystone Driller Co. v. General Excavator Co., supra. As Mr. Justice Butler stated in applying the clean hands maxim in Keystone Driller Co. v. General Excavator Co., supra, 290 U.S. at pages 245, 246, 54 S.Ct. at pages 147, 148, 78 L.Ed. 293:

"They [courts of equity] apply the maxim requiring clean hands only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation. * * * They apply the maxim, not by way of punishment for extraneous transgressions, but upon considerations that make for the advancement of right and justice. They are not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion."

The West Virginia court, in the cases cited above, and the federal courts have been uniformly consistent in the liberal, untrammelled application of this fundamental equitable doctrine. E. g., Wolf v. Citizens Bank & Trust Co., 4 Cir., 1937, 92 F.2d 233, 236; Michigan Pipe Co. v. Fremont Ditch, Pipe Line & Reservoir Co., 8 Cir., 1901, 111 F. 284, 287 et seq.; Weegham v. Killefer, D.C.1914, 215 F. 168, 171, affirmed, 6 Cir., 1914, 215 F. 289; Cleveland-Cliffs Iron Co. v. Arctic Iron Co., 6 Cir., 1919, 261 F. 15, 23, 24, certiorari denied 1920, 251 U.S. 558, 40 S.Ct. 179, 64 L.Ed. 413. Also, cf. Note in 4 A.L.R. 44, 70, 85. In the light of the fraud that surrounded the sale of stock by the Ford group, and in the light of the hardships that would result from the enforcement of the one-sided sales agreement, we believe that the doctrine of clean hands was properly applied by the District Judge.

For the foregoing reasons, the judgment of the District Court is affirmed.

Affirmed.

NORTHCOTT, Circuit Judge, concurs in the result.