### HALL et al. v. COLLINS et al.
### No. 5480.

Court of Civil Appeals of Texas. Amarillo.
Nov. 2, 1942.

Rehearing Denied Dec. 14, 1942.

Second Motion for Rehearing Denied
Jan. 4, 1943.

J. Shirley Cook, of Vernon, for appellants.

Oswalt & Hollars, of Vernon, for appellee Nannie Mae Collins.

L. P. Bonner, of Vernon, for appellee S. B. Halford.

FOLLEY, Justice.

This is the second appeal of this case. Our opinion in the first appeal is reported in 151 S.W.2d 338, wherein we reversed and remanded the case because of violations of the provisions of Article 3716, Vernon's Ann.Civ.Stat., relative to transactions with, and statements of, a deceased person. In order that this opinion may be complete within itself, we shall restate, without quotations, some of the same facts found in the former opinion, making such changes as the present record requires.

This suit is a controversy between the four surviving children of Mrs. Lillie Halford, deceased, involving 640 acres of land in Wilbarger County, Texas, known as the E.¼ of Section 44 and the E.½ and the S.W.¼ of Section 45, all in Block 12, H. & T. C. Ry. Co. Survey. The four children consist of two daughters, Mrs. Nannie Mae Collins and Mrs. Sarah Elizabeth Hall, and two sons, S. B. Halford and J. B. Halford, who are the only heirs at law of Mrs. Halford, deceased.

Mrs. Halford's husband died in 1910, at which time it appears that he and Mrs. Halford owned no real property. In 1923 Mrs. Halford purchased from her parents, D. Magness and wife, the N.W.¼ of Section 45 in said Block 12, which land she owned at the time of her death on December 6, 1935. This one-fourth section, referred to as the home place, is not involved in this controversy except incidentally, as shall hereinafter appear. In 1927 J. B. Halford purchased from his Magness grandparents the E.¼ of Section 44 and the E.½ of Section 45, above described, executing notes for a part of the purchase price. Not being able to pay for the land, on January 16, 1933, which was after the death of his grandparents, J. B. Halford reconveyed this 480 acres to the Magness estate in consideration of the cancellation of the indebtedness thereon. On the same day, in a settlement with the other heirs of the Magness estate, Mrs. Halford acquired from said estate, by deed, this same 480 acres and the S.W.¼ of Section 45 as her separate property. Also, at the same time and in the same transaction, Mrs. Halford, by general warranty deeds, conveyed the S.W.¼ of Section 45 to her daughter, Mrs. Sarah Elizabeth Hall, and the E.¼ of Section 44 and the E.½ of Section 45 to her son, J. B. Halford, the latter receiving the same 480 acres of land which he had, on the same day, conveyed to the Magness estate. The consideration recited in each of the deeds from Mrs. Halford to her son and daughter, respectively, was one dollar and love and affection. At the time these deeds were executed, Mrs. Halford was surety on the indebtedness of her other son, S. B. Halford, to the First State Bank of Vernon, Texas in the sum of about $6,000. The record shows that on this same day this indebtedness was renewed to the bank with Mrs. Halford again surety thereon. Also at such time the other daughter, Mrs. Nannie Mae Collins, had been absent from Wilbarger County for about two years. There was proof to the effect that her whereabouts were unknown to her Wilbarger County relatives, they thinking her to be dead. Mrs. Collins, however, resided in Dallas County, Texas from 1931 until 1937, when she learned that her mother had died in 1935, whereupon she returned to Wilbarger County.

Mrs. Halford died intestate and Mrs. Hall was appointed administratrix of her estate by the County Court of Wilbarger County. Such administration is still pending. The only real property listed in the inventory and appraisement of the estate of the deceased is the N.W.¼ of Section 45 which was valued at $3,000 and was owned by Mrs. Halford at the time of her death, and against which there is now an indebtedness of about $5,000. This indebtedness is the balance due upon the original debt of S. B. Halford to the First State Bank which amounted to more than $5,000 at the time of the transfer of the lands here involved to J. B. Halford and Mrs. Sarah Elizabeth Hall. This indebtedness is now held by Mary Schmoker and is secured by a deed of trust executed by the administratrix upon the 160 acres of land inventoried in the estate of Mrs. Halford. This indebtedness is all that is shown existing against the estate of Mrs. Halford. It

also appears that at the time this indebtedness was transferred to Mary Schmoker, S. B. Halford executed a deed, conveying his undivided one-fourth interest in the N.W.¼ of Section 45 to Mrs. Sarah Elizabeth Hall.

With the above factual background this suit was filed by Nannie Mae Collins against her sister, Mrs. Hall, and her two brothers, S. B. Halford and J. B. Halford. Mrs. Hall being under coverture, her husband, William M. Hall, was also a defendant in this suit. Mrs. Collins sought recovery from her sister and brothers of an undivided one-fourth interest in the 160 acres of land deeded to Mrs. Hall and in the 480 acres of land deeded to J. B. Halford. As in the former trial, S. B. Halford filed an answer and cross action in which he sought recovery against all of the other parties of an undivided one-fourth interest in the same land. Both complaining parties again assert that the deeds conveying the respective lands to J. B. Halford and Mrs. Hall were merely conveyances in trust for the benefit of Mrs. Halford and her estate and that J. B. Halford and Mrs. Hall held such lands only in their capacities as trustees for the benefit of the four children of the deceased. In the former trial, as indicated in our former opinion, the recovery was chiefly predicated upon the theory that the grantees in such deeds reconveyed the same property to their mother in other deeds which were not recorded so as to leave the apparent ownership in J. B. Halford and Mrs. Hall. In the instant trial the same theory is pleaded only in the alternative. The claimants rely this time chiefly upon an alleged oral contract between S. B. Halford, on the one hand, and J. B. Halford and Mrs. Hall, on the other, wherein it was agreed that their mother should convey the lands to J. B. Halford and Mrs. Hall, to be held in trust for the benefit of the grantor and her estate, the specific reasons therefor being more fully set out below. Both complainants asked for judgment for their respective one-fourth interests in the land and sought cancellation of the deeds from Mrs. Halford to J. B. Halford and Mrs. Hall. In addition thereto, S. B. Halford asked for cancellation of his deed to Mrs. Hall for his undivided one-fourth interest in the N.W.¼ of Section 45. The pleadings of J. B. Halford and Mrs. Hall are not important.

Upon special issues submitted, as material to this controversy, the jury found that prior to the execution of the respective deeds by Mrs. Halford, it was agreed by and between J. B. Halford, S. B. Halford, and Mrs. Sarah Elizabeth Hall that the grantees in such deeds should hold the land described therein for the benefit of all the children of Mrs. Lillie Halford in equal shares; that at the time such deeds were executed it was agreed between J. B. Halford, S. B. Halford, and Mrs. Sarah Elizabeth Hall that J. B. Halford and Mrs. Sarah Elizabeth Hall would make a deed, conveying back to Mrs. Halford the same land conveyed to them by the deceased; and that no such deeds of reconveyance were ever made or delivered to Mrs. Halford. After overruling the motion of J. B. Halford and Mrs. Hall for a peremptory instruction and their motion for judgment non obstante veredicto, the court rendered judgment that Mrs. Collins and S. B. Halford each recover from the other children, respectively, an undivided one-fourth interest in the 640 acres of land in controversy. It was further adjudged that the deeds conveying the land to J. B. Halford and Mrs. Hall be canceled and that the title thereto be divested out of each of them except for an undivided one-fourth interest therein. The court also decreed that the deed from S. B. Halford to Mrs. Hall, purporting to convey an undivided one-fourth interest in the N.W.¼ of Section 45 was, in fact, a mortgage to secure the payment of the $5,000 loan in favor of Mary Schmoker, and ordered that upon the payment of such indebtedness, his deed be canceled. The latter tract of land was not otherwise affected by the judgment. A one-fifth interest of the recovery of Mrs. Collins was decreed in favor of W. D. Hollars, her attorney. From this judgment the appellants, Mrs. Hall, her husband, and J. B. Halford have prosecuted this appeal. However, since William M. Hall is only a nominal party, our reference hereinafter to the appellants will indicate only J. B. Halford and Mrs. Hall.

From the above findings of the jury, it is apparent that the alternative theory of recovery relative to a reconveyance of the land from the appellants to Mrs. Halford has been eliminated from this case. No reconveyance having been made, the agreement to reconvey must fall because it contravenes the statute of frauds. Vernon's Ann.Civ.St. art. 3995. Allen v. Allen et al., 101 Tex. 362, 107 S.W. 528; Whittenburg et al. v. Miller, 164

S.W.2d 497. The appellees are thus relegated to the asserted contract between S. B. Halford and the appellants, which appellees insist constituted a trust wherein appellants held the land only as trustees for the benefit of the four children in equal shares. These findings were not entirely in harmony with the pleadings of the appellees, because they alleged that the land was held in trust for Mrs. Halford and her estate, but from our conclusions hereinafter expressed, we think this discrepancy becomes immaterial.

The appellants assign error in the court's action in refusing to direct a verdict in their favor and in overruling their motion for judgment non obstante veredicto, and in these assignments, and in many others, attack the alleged agreement as being invalid and unenforceable. However, as we view this case, the controlling issue in it is whether the agreement, as alleged and proved, and upon which the appellees must solely rely, is such as falls within that class of transactions involving conveyances to a trustee with a view of defrauding creditors, which transactions are not the subject of the creation or enforcement of trusts. Suffice it to say that we think the record before us adequately presents this question. In order to clarify our conclusions on this issue, we shall state some of the allegations of the appellees relative to this agreement, and some of the evidence in support of the same.

The appellees, as before, filed separate pleadings. Mrs. Collins alleged that her mother received and acquired the lands in controversy by inheritance on January 16, 1933; that at the time she acquired the land S. B. Halford was looking after and assisting in the management of the home place of Mrs. Halford; that just prior to January 16, 1933, some dissension arose between S. B. Halford and the appellants as to the manner in which S. B. Halford was conducting and advising in the management of the estate, the appellants contending that S. B. Halford had received more than his part of the estate and that if he was not prevented from mismanaging said estate, he would continue to acquire more than his portion thereof; that in order to hold said estate intact and to be assured that no further or future personal benefits might be acquired by S. B. Halford, the appellants and S. B. Halford entered into an agreement that their mother would execute the deeds to the appellants for the respective lands with the specific understanding that appellants would hold said lands in trust for the sole use and benefit of Lillie Halford and her estate; that Mrs. Hall informed Mrs. Halford of the agreement and that the latter assented thereto; that pursuant to such agreement the deeds were executed for such purpose; that she (Mrs. Collins) was away from Wilbarger County at the time and knew nothing of the agreement, but that if she had been present, she would have acquiesced therein, and "here and now accepts said agreement"; and that it was further agreed between S. B. Halford and the appellants that if Mrs. Collins was still living she was to receive her portion of said estate.

S. B. Halford alleged that sometime prior to January 16, 1933, he was indebted to the First State Bank of Vernon and that his mother was surety for him on his note payable to such bank; that when it became known to the appellants that his mother was to get a deed from the other Magness heirs and they had learned that the mother had signed his note at the bank, they immediately began to insist that Mrs. Halford convey to them the land so inherited by her, insisting that if she did not, they were afraid she might lose it or get it involved with some of his business transactions, when it would be lost to the mother; that such insistence continued until it became almost intolerable and caused so much trouble in the home that finally he told them if the mother desired to convey the lands to them, he would not oppose it, provided they would agree with him to reconvey the same land to his mother, the deeds of reconveyance to remain off the records unless Mrs. Halford desired to record the same, and that in case the mother should die or the deed be lost, the appellants would hold the lands as the property of the mother and would divide the same equally between all the children of the mother; that having confidence in the appellants, he made no objection to the conveyances and that thereafter, on January 16, 1933, the conveyances were made; and that the deeds were made by Mrs. Halford in trust, conveying the lands to the appellants under an agreement between the said Lillie Halford and the appellants that the latter would convey the lands back to Mrs. Halford, the deeds of reconveyance not to be recorded unless Mrs. Halford desired to do so, and that the appellants would hold such lands in their names for Mrs. Halford and her

heirs, and in case she should die, they would divide the lands so conveyed between the heirs of Lillie Halford.

The only testimony introduced in support of the above alleged agreement was that of S. B. Halford. The appellants each denied the existence of such an agreement, they contending that the deeds were absolute and unimpressed by any trust. They also denied the execution or delivery of any deeds of reconveyance from them to Mrs. Halford. Their evidence in this respect was strongly corroborated by Hy Rogers, the scrivener who prepared all of the deeds. According to his testimony, he prepared all of the deeds on the same day and heard parts of the conversations between Mrs. Halford and the other Magness heirs, and between Mrs. Halford and all the parties to this suit except Mrs. Collins. It was his positive testimony that there were no deeds of reconveyance from the appellants to Mrs. Halford, that there was no mention made of any kind of trust, and that Mrs. Halford told him she was conveying the land to J. B. Halford and Mrs. Hall as a gift, which was the reason he assigned for the consideration recited in the respective deeds.

The substance of the testimony of S. B. Halford on this question, in narrative form as gleaned from various portions of the statement of facts, is as follows:

"Well, we talked this over. We were talking about the debts that I owed the First State Bank and how I was going to execute my part of the estate to them so that I couldn't involve my mother any further in any business transactions. Well, they agreed that if my mother would make the deeds, they would convey back to her to hold in trust for the rest of the family. My sister was gone and we didn't know where she was. We couldn't sell the property for any value. Property was down and we decided the best thing to do was to borrow the money and pay off my loan to the First State Bank. That was my indebtedness. We practically agreed on these terms, if we could get the deeds made that way, which we did. J. B. was to get 480 acres and Mrs. Hall 160 acres. They were to hold it for the rest of the estate. They further agreed that in doing this, I would still have the same amount coming to me as they had, after my indebtedness was paid. They were to keep the land until this debt became paid. They were to keep it until we got in better shape

than we were so we could pay it. I owed over $5000. My mother signed the note. They said if I would let them have this land in their names, they would hold it in escrow for me, my part of it, and then we would pay this note off, and when it was paid off, they would divide this property equally and I would share in everything out there in the way of livestock and stuff that was raised on the place. They said they would make deeds back to my mother which they did."

In addition to the above testimony in narrative form, in order to more clearly present other testimony from the same witness, we quote the following in question and answer form:

"Q. (By Mr. Bonner): Do you know why they desired your acquiescence in obtaining these deeds from your mother, do you know why? A. Well, yes, they were afraid that—(interrupted).

"Court: That is all he asked.

"Q. What did they say to you about it? A. Well, they said that if I would make the deeds back to them they would make the deeds back to my mother, and I told them that that would be agreeable with me, if they would do that.

"Q. Did they say why they wanted you to agree to it? A. Well, because I was indebted, so that I wouldn't involve my mother in any other contract.

"Q. What did you say in reply to that? A. I told them I would agree to it if they would deed this land back to my mother.

"Q. Did you talk with Johnnie (J. B. Halford) or Mrs. Hall after you had brought your mother to Hy Rogers' office for the purpose of making these deeds, did you talk to either one of them about the deeds and the making of the deeds after that time? A. Yes, sir.

"Q. Well, state what each of them said to you about it? A. Well, they said that they would hold it in escrow until we got this debt that I owed The First State Bank paid off—at that time Mr. Schmoker it turned out to be—and pay that note off and we would all have, everyone would have their part, and in case that my sister didn't show up—her daughter was living with us at that time—that she and her son would be living and they would have an equal share in their part of it."

From the above allegations and proof, upon which both of the appellees must necessarily rely, we think it is evi-

dent that the alleged trust was instigated and executed for an illegal and fraudulent purpose. Viewing the agreement in the light of the case made by the appellees, it is apparent that if the conveyance from Mrs. Halford to the appellants was not absolute, as all the testimony except that of S. B. Halford indicated, the same constituted a fictitious and simulated transaction wherein the real title was to remain in the deceased and the apparent title was to be vested in the appellants for the sole purpose of avoiding the subjection of such land to the payment of S. B. Halford's debt to the bank, upon which the deceased was a surety. No other purpose was alleged, shown, or intimated for such a simulated transfer, nor can we conceive of any other reason therefor. A contract thus conceived and executed in fraud is not the subject of affirmative relief from the courts and equity will leave the parties to such transactions in the position in which they have placed themselves. The courts never lend themselves to the enforcement of such nefarious contracts and undertakings which are in violation of law and repugnant to public policy. 42 Tex. Jur. 671, § 63; Groves v. Whittenburg et al., Tex.Civ.App., 120 S.W.2d 870, and authorities cited.

■ In Rogers et al. v. Rogers et al., Tex.Com.App., 240 S.W. 1104, 1105, in a case almost squarely in point with the facts of the instant case and wherein a trust was sought to be impressed upon a simulated transaction, it is said: "It is well settled that a trust created for a fraudulent purpose will not be enforced, nor the person creating the same, his heirs or devisees relieved by setting aside the conveyance and restoring the property. Equity will leave the parties to such transactions in the position in which they have placed themselves, refusing all affirmative aid to either of the fraudulent participants."

Also, in Roth et al. v. Schroeter et al., Tex.Civ.App., 129 S.W. 203, 205, writ refused, in a situation very similar to that here involved, it is stated: "Inasmuch as the appellants are the heirs of Christian Schroeter and all of them, except Louis and Otto, base their right to recover upon inheritance from him, they cannot avoid their ancestor's deed to his wife, Alvina, upon the ground that it was made for the purpose of defrauding his creditors so as

to let in title by inheritance. As to that matter, they stand just as he would were he alive and invoking a court of equity to annul his deed on that account. Equity has no healing balm for the fraudulent acts of any one, nor will it salve them over for his or his children's enjoyment. * * * A trust sought to be created by the grantor can no more be ingrafted upon his fraudulent deed than can be a sound stem upon a rotten trunk. The one will not survive and fructuate in equity, nor can the other by nature. * * *"

In further support of this same rule are many authorities, among which are the following: Wells v. Jamison, Tex. Com.App., 252 S.W. 1023; Maples v. Maples et al., Tex.Civ.App., 275 S.W. 1091; Harrison v. Davis, Tex.Civ.App., 58 S.W.2d 1025; Robb v. Robb et al., Tex. Civ.App., 41 S.W. 92; Hunter v. Magee et al., 31 Tex.Civ.App. 304, 72 S.W. 230.

■ This rule is applicable, not only to those actually participating in the fraudulent acts, but it is also applicable to an innocent heir or beneficiary seeking to recover thereon, the position Mrs. Collins occupies in this case. In Eastham v. Roundtree, 56 Tex. 110, 114, Justice Stayton, speaking for the Supreme Court on this question, said:

"If one-half of the purchase money was paid by the father under such circumstances as made such investment for the benefit of the intervenor fraudulent as to his creditors, then it is certainly true that all the claim she has is based upon a transaction illegal, because made to hinder, delay and defraud creditors, and from which no resulting trust can spring in her favor, although she may not have participated in the fraud and may not have had any knowledge thereof; for in such case she appears as the intended donee of her father, through a transaction forbidden by law.

"To permit a man's children to recover property which he had fraudulently placed in the name of another for the purpose of placing it beyond the reach of his creditors, upon the ground that it was intended for their benefit, would be to contravene a well-settled public policy, and to offer a premium to dishonesty. It is a universal rule that no one can claim a right through the fraud of himself or another. Ex turpi causa non oritur actio. No resulting trust can spring from an act contrary to public policy or a statute."

It therefore follows that under this record the court was without authority to decree the recovery of the interest in the land in favor of the appellees or to render judgment canceling the deeds.

The judgment of the court, granting the appellees, S. B. Halford and Mrs. Nannie Mae Collins, respectively, a recovery against the appellants of an undivided one-fourth interest in the 640 acres of land in controversy and canceling the deeds in question, is reversed and judgment is rendered that appellees take nothing. However, there is no assignment of error properly before us, attacking that portion of the judgment decreeing that the deed from S. B. Halford to Mrs. Hall, conveying his interest in the N.W.¼ of Section 45, was a mortgage and should be canceled when his debt is paid, and nothing fundamentally erroneous appears therein. Therefore, that part of the judgment is affirmed. In all other respects, the judgment is reversed and rendered that the appellees and the above-named attorney take nothing by this suit.

Reversed and rendered in part and affirmed in part.

On Motion for Rehearing.

We have heretofore overruled the first motion for rehearing of the appellee, Nannie Mae Collins. Since that time we have permitted her to file a second motion for rehearing. Our opinion overruling the first motion will be withdrawn and the following substituted as our disposition of both the first and second motions for rehearing.

The appellee, Mrs. Collins, challenges the sufficiency of the appellants' pleadings to support our holding in our original opinion relative to the statute of frauds being a bar to appellees' recovery as based upon the alleged agreement to reconvey the lands, which purported agreement is supported by a jury finding.

Upon re-examination of the pleadings of the appellants, we have concluded that the same are insufficient to preserve this point for our consideration. However, such fact, in our opinion, will not affect our judgment heretofore entered. The alleged agreement to reconvey the lands is but a portion of the whole illegal transaction and constitutes only another phase of the same purported trust sought to be enforced by the appellees, and the equitable powers of the court will

be denied for the same reasons stated in our original opinion.

Mrs. Collins also attacks the sufficiency of the appellants' pleadings to present the question of the illegality of the purported trust, the basis for our holdings herein. The appellees are seeking to invoke the equitable powers of a court to establish a trust in their favor, and under such circumstances they must come into court with clean hands. The defense of unclean hands need not be pleaded, but the doctrine may be applied by a court sua sponte. In 30 C.J.S., Equity, p. 487, § 97, on this issue it is said:

"The unconscionable character of a transaction between the parties need not be pleaded or set up as a defense. Whenever it is disclosed the court will of its own motion apply the maxim. It does not matter at what state of the proofs or in what order a lack of clean hands is discovered. A party cannot waive application of the clean hands rule at the instance of the court, nor does such application depend on the wish of counsel."

If the above quotation was not the rule, we think the pleadings of the appellees, as outlined in our original opinion, were sufficient within themselves to reveal the illegality of the transaction, and it is well settled that in determining whether a judgment is supported by the pleadings, the court will consider the pleadings of both parties, and the omissions in the pleadings of one party may be supplied by the allegations of the other. Ray et al. v. Barrington, Tex.Civ.App., 297 S.W. 781, 783; Ormsby et al. v. Ratcliffe et al., Tex. Com.App., 36 S.W.2d 1005.

The appellee, Mrs. Collins, further asserts that we erred in our original holdings because no injury was sustained by the creditor bank and thus the doctrine we have applied is inapplicable. In this connection, she further asserts that the property of the deceased was sufficient to pay the indebtedness due the bank at the time of the transfer of the lands and asks that we make additional findings in this respect.

The record does not sustain the latter contention. At the time of the transfer of the lands in 1933, the indebtedness was more than $6,000. The value of the property of the deceased, as shown by the inventory and appraisement in 1936, was $5864. This included the quarter-section

of land owned by the deceased at the time of her death, which was valued at $3,000, and $2,864 in personal property. It is our opinion, however, that it is immaterial that no injury has thus far been suffered by a creditor on account of the transaction involved. It is our further opinion, under the facts of this case, that it is also immaterial that the indebtedness might have been satisfied out of property retained by the deceased. It is the intent and motive of the parties at the time of the transfer with reference to the existing debt, and not the results that follow, which control the creation of the trust and determine the rights of the appellees to have it enforced in a court of equity. In 30 C.J.S., Equity, p. 483, § 95, on this question we find this language:

"The fundamental requisite in determining whether a party comes into court with clean hands is the moral intent, and not the actual injury done. Relief may be barred by improper conduct even though it caused no pecuniary injury, and a fraud doer is not entitled to relief on the ground that in view of after results the fraud was unnecessary."

The motions for rehearing of the appellee, Nannie Mae Collins, are each overruled.