James A. GREEN, Jr., et al., Appellants,

v.

A. K. MEADOWS, Appellee.

No. 16318.

Court of Civil Appeals of Texas, Houston (1st Dist.).

Nov. 7, 1974.

Rehearing Denied Jan. 9, 1975.

Fulbright & Crooker, Thomas P. Sart-welle, Russell H. McMains, Houston, for appellants.

Moore, Morris & Payne, Louis M. Moore, Houston, for appellee.

COLEMAN, Chief Justice.

This is a suit for an accounting growing out of an alleged partnership combined with a suit for damages for malicious prosecution. The cause was submitted to a jury, and based on its verdict, a judgment was rendered for the plaintiff, A. K. Meadows, against James A. Green, Jr. & Company, a Corporation, and James A. Green, Jr., jointly and severally. The principal issues involved relate to the suf-

ficiency of the evidence to support the verdict of the jury.

In 1967 James A. Green, Jr. and A. K. Meadows entered into a customs house brokerage business in Houston known as Meadows & Green. This business relationship terminated in October, 1969. There is a disagreement between the parties as to whether Meadows occupied the status of a partner rather than that of employee of James A. Green, Jr. There is also disagreement as to whether Meadows was to be compensated for his work during the first few months of the business relationship and whether certain expenses for which Meadows had been compensated were properly business expenses.

Prior to the termination of the business relationship between the parties Meadows admittedly wrote various company checks to pay personal debts. Green reported this matter to the District Attorney of Harris County, who presented the matter to the Harris County Grand Jury. The Grand Jury returned two felony embezzlement indictments against Meadows. After a trial of one indictment resulted in an acquittal, the other was dismissed.

Meadows contended that his business relationship with Green was that of a partnership and, therefore, he could not be guilty of embezzlement for using company funds for personal debts. Green maintained that appellee was an employee of Meadows & Green and nothing more. This contention was documented by numerous business records, but the jury concluded that a partnership existed and that Green owed Meadows a sum of money, and further that Green maliciously prosecuted appellee. Damages were found in the total sum of $27,921.35.

■ Green and the corporation have preserved no challenges to the factual sufficiency of the evidence to support the jury's answers. All of appellant's fact points, though properly worded by referring only to the trial court's error in overruling defendant's motion for new trial, are referable to assignments of error that can only be construed as legal sufficiency assignments. All points containing great weight and insufficient evidence terminology are germane to assignments that begin "The court erred in submitting to the jury" and "in rendering judgment." The trial court cannot refuse to submit an issue or render judgment on the verdict because of the factual insufficiency of the evidence. Chemical Cleaning, Inc. v. Chemical Cleaning & Equipment Service, Inc., 462 S.W.2d 276 (Tex.1970); McDonald v. New York Central Fire Insurance Company, 380 S.W.2d 545 (Tex.1964). We can consider only those points of error raising the issue of the legal sufficiency of the evidence to support the jury's answers to the issues submitted. In determining these questions we must consider the evidence in the light most favorable to the jury's answers and must disregard evidence in conflict therewith.

■ Before the trial court would be authorized to grant an instructed verdict, or to enter a judgment non obstante veredicto, it must appear, in the first case, that there is no evidence raising a jury issue on a fact vital to the plaintiff's case, or, in the other case that there is no evidence to support the jury's verdict on such a vital issue. Travelers Insurance Company v. Williams, 378 S.W.2d 110 (Tex.Civ.App.—Amarillo 1964, writ ref. n. r. e.).

■ Many cases may be cited for the proposition that actions for malicious prosecution are not favored in the law, and that in such actions the proof must be positive, clear and satisfactory. Montgomery Ward & Company v. Kirkland, 225 S.W.2d 906 (Tex.Civ.App.—San Antonio 1949, writ ref. n. r. e.). In Sanders v. Harder, 148 Tex. 593, 227 S.W.2d 206 (1950), the court said:

 " . . . In certain types of cases courts have frequently pointed out that defects must be established by clear and convincing evidence. That rule, as said

in Carl v. Settegast, Tex.Com.App., 237 S.W. 238, arose at a time when such suits were cognizable only in courts of chancery where matters of fact, as well as of law, were tried by the chancellor. Verdicts of juries in those courts were advisory only. In our blended system the field in which that rule operates is very narrow. In practical effect it is but an admonition to the judge to exercise great caution in weighing the evidence. No doctrine is more firmly established than that issues of fact are resolved from a preponderance of the evidence, and special issues requiring a higher degree of proof than preponderance of the evidence may not be submitted to a jury . . . In ordinary civil cases trial courts and Courts of Civil Appeals may set aside jury verdicts and grant new trials when, in their opinion, those findings, though based upon some evidence, are against the great weight and preponderance of the evidence, but they may not render a judgment contrary to such findings. In those cases in which the 'clear and convincing' rule is applicable if, in the opinion of the trial judge, the evidence in support of the verdict does not meet the test of that rule, he may set it aside and order a new trial; but he should not render a judgment contrary thereto."

In this case the appellant did not present to the trial court in its motion for new trial, with one exception to be discussed, the contention that the plaintiff failed to prove by positive, clear, and satisfactory evidence, the necessary elements to establish a cause of action for malicious prosecution.

It is suggested in Briscoe v. Bright's Administrator, 231 S.W. 1082 (Com.App. of Texas, Sec. B, judgment adopted), that the question of the sufficiency of the proof to meet the requirement that the elements of the cause of action be established clearly and satisfactorily can be presented as a question of law. In that case the court said:

". . . Conceding for the purposes of this case that the contract sought to be enforced falls within the rule requiring that its terms be proved clearly and satisfactorily and treating the question as one of law only, the evidence must be viewed most strongly in support of the trial court's judgment. The fact that the witnesses who testified may not have been disinterested, or may have made conflicting statements, or that their credibility may have been attacked, are matters with which it is not our province to deal. As we understand the rule contended for, it is not violated by objections to the evidence of this character. It only requires that the terms of the contract essential to recovery be supported by evidence sufficiently clear for the court to determine what those terms were without resorting to inference or conjecture. In this, as in every other class of cases that we now recall, the credibility of the witnesses and the weight to be given to their testimony are questions solely within the province of the jury, subject, however, to be revised by the trial judge and *the Court of Civil Appeals*. . . ." (emphasis added)

In determining the legal sufficiency of the evidence to support the jury's answers to the issues submitted we will be guided by these rules.

Mr. Meadows testified that he began work with customs house brokers as an employee in January of 1956. In 1966 he began his own business called "Meadows Delivery Service" which entailed deliveries for importers and exporters, typing and entry work for brokers, and that he had been operating this business for about nine months before he got in touch with Mr. Green. He learned that Green was interested in opening a licensed customs house brokerage office in Houston. Subsequently they had several meetings during the

course of which Meadows told Green that he was not interested in being an employee; that he wanted to be a partner. They agreed that they would be partners and that the business would be operated under the name "Meadows & Green." It was agreed that Meadows would not be responsible for any of the losses, but that he would share in the profits. He testified that he was to get a salary; Mr. Green was to contribute all of the money, and that he (Meadows) would participate in the profits but that Green would take all the losses. Meadows' proportionate share of the profits was to be decided ". . . when we made a profit for the year." Again he testified that while it was agreed that he would participate in the profits "that . . . nothing definite had been established."

In order to do business as a customs house broker it is necessary to have a license from the United States Government. A corporation or a partnership may receive such a license, but the partnership must have at least two persons holding such a license, and a corporation must have at least two employees who are licensed. There is evidence that Green did not desire to start operating the business until a later date, but at the urging of Meadows executed a power of attorney authorizing Meadows to operate a licensed brokerage office under the authority of his personal license in September, 1967. At this time Meadows prepared and filed with the Assumed Name Records of Harris County, Texas, a certificate sworn to and signed by him as an agent of Green that the business operating under the name of "Meadows & Green" was a sole proprietorship owned by Green. He testified that he did this on the instructions of Green. The money furnished to Meadows by the corporation for the operation of the business was placed in Meadows' business bank account with the knowledge of Green. The money placed in this account was comingled with Meadows' personal funds. Up until December 4, 1967, when a Meadows & Green bank account was established, Meadows wrote checks on the account for his personal expenses as well as for the business expenses relating to the Meadows & Green operation. On December 4, 1967 Mr. Meadows and Mr. Green went in person to a bank where they opened a bank account in the name of Meadows & Green. In so doing they used forms furnished by the bank for a partnership account. The first of these forms is headed in large letters "DECLARATION OF PARTNERSHIP AND AUTHORIZATIONS TO FIRST CITY NATIONAL BANK OF HOUSTON, HOUSTON, TEXAS." Then follows a statement: "The undersigned desire to establish with you a deposit and checking account to be known as Meadows & Green and hereby certify that the said name is a trade name which we are using in the conduct of an unincorporated business owned entirely by the undersigned as co-partners, and said trade name has been properly filed for record with the County Clerk of Harris County, Texas." In the body of the instrument the following statement appears: "The undersigned authorize and request you to pay and charge to said account checks, obligations and orders for the payment of money drawn on or payable at, or which shall be paid or honored by your bank when so signed, whether payable to the order of any of said signers or not: . . ." This was a one-page instrument which was signed by A. K. Meadows and J. A. Green, Jr. The parties also signed another instrument reading: "NAME" (with a blank which was filled in "Meadows & Green") a partnership. "First City National Bank of Houston is hereby authorized to recognize any one of the signatures below in payment of funds or transaction of any other business of —————————— a Partnership."

While Mr. Green testified that he was in a hurry on the date in question and did not read the instrument, an examination of the copy introduced in evidence gives the impression that even a casual glance at the instrument would denote the partnership nature of the agreement. In the summer of 1967 Meadows went to Kansas City,

Missouri where the books of Meadows & Green were set up. From the books, checks and check stubs it can be ascertained that the funds supplied to Meadows & Green were furnished by the corporation. Prior to his withdrawal from the firm all of the checks were written by Mr. Meadows and he made the entries in the books up until January, 1969. After that date the check stubs, cancelled checks, deposits, invoices and other records were sent to Kansas City each month to be posted on the books of the company. Prior to January, 1969 this same accounting information was periodically gathered from the Houston office by employees of the corporation and such accounting information was posted in the corporate control ledger in Kansas City. Mr. Green testified that in December of 1968 he wrote a memorandum to A. K. Meadows advising him that various company checks were apparently being written by Meadows for "petty items" which appeared to be for personal expenses and not business expenses and directing him not to write company checks for personal items. Mr. Meadows denied that he received this memorandum, but it indicates that at least as of December, 1968 Mr. Green was personally aware of the fact that Mr. Meadows frequently wrote checks to cash or to himself. The purpose for which such checks were drawn appears on the check stubs in most instances. On a check written to cash a notation would appear in the check stub such as "Petty Cash", "Auto Expense," "Entertainment," "Postage," or "Automobile Expense." Most of the checks written to A. K. Meadows for salary showed on the stub the gross salary, the Withholding, Social Security, and Net. These checks were written at irregular intervals. Some such checks apparently were written as draws against salary. A loan account for A. K. Meadows was set up on the books of the company.

The checks which apparently were the cause of this controversy were written on July 17, 1969. Six checks were written on that date, one to E. Atkins, the stub to which bears notation "Auto Insurance for A. K. M." The stubs for the other checks also bear this notation.

The A. K. Meadows salary checks during 1968 were in the amount of $136.56 per week. They bear a notation "Salary. Gross $160.00, Social Security $7.04, Withholding $16.40." However, Check No. 1095 drawn on February 5, 1968 according to the check stub was written to A. K. Meadows in the amount of $66.56 bearing notation "$90.00 gross. Social Security $7.04, Withholding $16.40." Check Stub No. 1127 reflects that on March 5, 1968 a check in the sum of $210.00 was made out to "Cash" bearing notation "Loan." Stub No. 1128 shows a check to "Cash" in the sum of $27.51 with a notation "Auto Expense." Check Stub No. 1129 shows a check made out to "Cash" in the sum of $32.50 with a notation "Duplicator Repair." Check Stub No. 1172 reflects a check in the amount of $25.12 made out to the order of "Cash" with a notation "Auto Expense." Stub No. 1173 reflects a check in the amount of $10.00 payable to "Cash" with a notation "Entertainment."

Mr. Green testified that he did not form a partnership of any kind with Meadows; that Meadows had no customs house broker's license which was required by federal regulations for a partnership operation. Meadows was the general manager of the office. He had the authority to hire and fire personnel and was responsible for paying all expenses of Meadows & Green. Meadows was to have compensation of the firm at $160.00 per week. He was to get two weeks' vacation with pay and he could take his vacation when and as he pleased. Meadows was to use his own automobile in the business and was to be compensated for one-half of the automobile expense. Meadows was to make sales contracts, bring in new customers, and handle items as required by Customs. He was to check invoices, pay accounts as they became due, and to make the original entries in the books. He had the responsibility for and was authorized to write checks for expens-

es pertaining to the operation of the business. He had the authority to write checks to himself for withdrawals or salaries, and to write checks to reimburse himself for out-of-pocket expenditures for entertainment, supplies, travel expense, documentation fees, postage, duties, consular fees, business promotion, certifications, and notary fees. Green testified that he was aware that Meadows would write checks for advances on his salary; that Meadows would sometimes overdraw his salary and sometimes underdraw his salary; he testified that Meadows was authorized to draw on his salary in almost any manner he wanted, saying: "The responsibility was his. I gave it to him." Green set up the books of Meadows & Green and was aware of the bookkeeping, financial statements and things of that nature that had to do with the books. Meadows didn't participate in setting up the books because he didn't know how to set them up. Green testified that there was communication between his office and Kansas City and the Meadows & Green office in Houston with respect to taking care of the books; that from time to time the financial records, including the bank statements of Meadows & Green were sent to him in Kansas City. He had access to and got the financial records of the firm frequently and his bookkeeper and auditor in Kansas City did a lot of work on the books.

It is undisputed that a loan account was carried on the books of the firm for A. K. Meadows. Green knew that there was such an account; that the first item in the account was a loan for $410.00; that in December of 1968 the loan account and/or account receivable account had a balance of $506.00 due to the firm by Meadows. Green testified that Meadows paid $65.00 on the account at one time; that he paid $778.00 on another occasion, and that he paid $1,050.00 on another occasion.

Green testified that from the time he and Meadows first started discussing their business relationship in 1967 throughout the time the firm was in operation he was discussing with Meadows the final solution of their business relationship. He was not interested in continuously coming down to Houston and he preferred that Meadows take the business over as soon as he got his license. He testified that Customs frowned on a clerk that was not a licensed customs broker being in charge of an office; that he wanted Meadows to take over the business, but that if it was necessary for him to own an interest in the business he would have been glad to do that. After Meadows got his license Green sent him a proposal to operate the business as a corporation. Meadows turned down this suggestion. In May of 1969 Meadows opened an independent customs house brokerage office in Tulsa, Oklahoma and he advised Green that he was interested in opening his own air freight business office at Inter-Continental Airport in Houston. After he learned that Meadows had written the checks on the company account for his personal indebtedness, and had opened an office in Tulsa, Green offered to sell the business to Meadows. Meadows made a counter offer to buy the business, but they were not able to agree on the terms of a sale. Green also made a written offer to Meadows to employ him as manager and treasurer of the office in Houston but Meadows refused the offer. Green testified that this offer was first made in the spring of 1969. It might be noted that the written contract contained a covenant against competition by Meadows in the event his business relationship with the corporation was terminated. The contract was terminable at any time at the will of either party.

Meadows testified that Green brought the employment agreement to him in October of 1969 for the first time and demanded that he sign it. Meadows testified that when he refused to sign the agreement Green became very angry and threatened him, saying: "Well, if you don't sign it, you are going to be behind the eight ball."

Green testified that according to a partial audit made by a certified public ac-

countant which he sent to Houston, Meadows owed him approximately $4,700.00. Meadows testified that Green demanded that he pay that amount, and that he told Green the figures were wrong. According to Meadows, on a subsequent date Green came to Houston and phoned him. Meadows refused to discuss the matter unless their respective attorneys were present. He suggested that they abide by the decision of their attorneys as to which party was indebted to the other. On another date Green again called Meadows asking him what he was going to do about the money and Meadows told him that he didn't owe him any money, that he (Green) knew those figures were not right. At that time, according to Meadows, Green stated, "I don't care whether they are right or not, I will prove they are right and I am going to turn them over to the District Attorney."

Mr. Green also went to see Mr. Kelley at the District Director of Customs and showed him the auditor's report. He testified that he might have generally discussed the revocation or suspension of Mr. Meadows' license. He requested that the Customs officials conduct an audit of the books of Meadows & Green. After he saw Mr. Kelley he went to his attorney's office and discussed the matter with him. He then went to see Mr. Delaney at the District Attorney's office. Mr. Green testified that he told Mr. Delaney that he was the owner of Meadows & Green. He later qualified this answer by saying that he told him that he owned the majority stock in James A. Green, Jr. and Company, "which would make me both ways, individually and as a corporation," the owner of Meadows & Green. He told him that Meadows was his employee and that Meadows had written a considerable number of checks without any authority for his personal use. He showed Mr. Delaney the auditor's report. He gave him certain checks and told him that Meadows had no authority to write those checks for his own personal use. Mr. Delaney requested that Green get

statements from the payees shown on the checks to the effect that the checks were credited to Meadows' personal indebtednesses. Green secured such statements from a number of the payees and gave them to Mr. Delaney. He was not called as a witness before the Grand Jury. The Grand Jury returned an indictment charging that Meadows and an employee of James A. Green, Jr., embezzled money belonging to James A. Green, Jr. Mr. Green testified at Meadows' trial on these charges. Both Mr. Delaney and Mr. Kelley testified that Mr. Green did not exhibit particular hostility toward Mr. Meadows, and did not urge them to take any action.

It is undisputed that Meadows signed the Assumed Name Certificate in which he represented by a sworn statement that the business was solely owned by James A. Green, Jr. He also filed two sworn statements with the Customs people in both of which he represented that he proposed to work as an employee of J. A. Green, Jr. & Company, his present employer. Neither Meadows nor Green filed a partnership return for income tax purposes. Both Meadows and Green knew that the corporation was reporting Meadows as an employee to the Internal Revenue Service. On his income tax return Meadows reported his income from Meadows & Green as a salary.

The Assistant District Attorney, Mr. Robert Delaney, testified that he interviewed Mr. Green, presented the facts to the Grand Jury, and handled the felony trial against Mr. Meadows. He testified nothing came to his attention that in any manner indicated that Mr. Green had not told him the full facts in his possession. He testified that the question of a partnership came up for the first time at the trial; that Mr. Green did not mention it. He learned of it when he issued subpoenaes to First City National Bank. If Mr. Green had told him that there was a partnership he would not have presented the case to the Grand Jury "because a partner can't steal from a partner." He also stated that if Mr. Green had told him that Meadows

had authority to write checks for personal expenses he would not have presented the matter to the Grand Jury.

Appellants have centered their attack on the jury's answers to Special Issues numbered 2, 4-a, 4-b and 5. Special Issue No. 2 asked whether the criminal prosecution for embezzlement against A. K. Meadows was instituted by James A. Green, Jr. or through his aid and cooperation. Special Issue 4-a inquires whether James A. Green, Jr., related fairly and honestly all the material facts then known to him about his business relationship with A. K. Meadows in the company known as Meadows & Green to Mr. Delaney before the Grand Jury indictments were returned. Special Issue 5-b inquires whether James A. Green, Jr. in doing what he did, if anything, to institute criminal prosecution against A. K. Meadows, acted without probable cause. Special Issue No. 5 asked whether James A. Green, Jr. in doing what he did, if anything, to institute criminal prosecution against A. K. Meadows, acted with malice.

In dealing with the topic of wrongful prosecution the American Law Institute, Restatement of the Law of Torts, Sec. 653, entitled "Elements of a Cause of Action," reads:

"(1) A private person who initiates criminal proceedings against another who is not guilty of the offense charged is liable to him for the harm done thereby if the proceedings

(a) were initiated

(i) without probable cause, and

(ii) primarily because of the purpose other than that of bringing an offender to justice, and

(b) have terminated in favor of the accused.

"(2) A private person who procures the institution of criminal proceedings against another is liable under the conditions stated in subsection (1)."

Comment (g) under Sec. 653, supra, reads:

"A private person who gives to a public official information of another's supposed criminal misconduct, of which the official is ignorant, obviously 'causes the institution of such subsequent proceedings as the official may begin on his own initiative, but giving such information or even making an accusation of criminal misconduct does not constitute a procurement of the proceedings initiated by the officer if left entirely to his discretion to initiate the proceedings or not . . .

"If, however, the information is known by the giver to be false, an intelligent exercise of the officer's discretion becomes impossible and a prosecution based thereon is procured by the person giving the false information. . . ."

The general rule set out in the Restatement is supported in principle by Usher v. Skidmore, 28 Tex. 616; Daughtry v. Blanket State Bank, 60 S.W.2d 272 (Tex.Civ. App.—Austin 1933, n. w. h.); Meyer v. Viereck, 286 S.W. 894 (Tex.Civ.App.—Galveston 1926, writ dism'd). See also 54 C. J.S. Malicious Prosecution § 17, p. 969.

Mr. Green testified that he took to the District Attorney the partial audit prepared by Mr. Dettenwanger, a certified public accountant. This report contained a statement: "I found a considerable number of checks which appear to be written by Mr. A. K. Meadows, the resident manager, for his own personal use. (See attached list)." This list identified by date, payee check number and amount some twenty-seven checks. Ten of these checks were made payable to Cash and three were made payable to A. K. Meadows. Mr. Green told the District Attorney that Meadows was not authorized to write checks for his personal use. Mr. Green testified that Meadows was authorized to write checks payable to Cash or to himself to reimburse himself for expenses related to the busi-

ness or for draws on his salary. The truthfulness of the statement that Meadows was an employee was put in issue by Meadows' testimony that his relationship to Green was that of a partner. This testimony is supported by the recitations in the instruments executed in connection with the opening of the bank account. There is evidence, therefore, which would support the conclusion on the part of the jury that Mr. Green began the investigation by giving the Assistant District Attorney false and misleading information.

This same evidence together with other circumstances and testimony which has been previously set out was sufficient to raise the issue of fact submitted as Special Issues 4-a and 4-b.

 There is also evidence raising an issue as to whether or not James A. Green, Jr. acted with malice in instituting criminal prosecution against Meadows. The trial court defined "Malice" as meaning a wrongful act done purposely to injure another. He pointed out in his instruction that a wrongful motive coupled with a wrongful act wilfully done to the injury of another constitutes malice. If Green had no reasonable grounds from the facts known to him to believe Meadows guilty of the offense charged, he acted without probable cause in instituting the prosecution. Meadows testified that Green told him that if he failed to execute the employment agreement he would be in trouble. The jury might well have determined from this and from the fact that Green also went to the Customs Bureau and presented the audit, together with other facts in evidence, that Green's motive in instigating the prosecution was to prevent Meadows from continuing to engage in the business of a customs house broker rather than an honest desire to see the law of the land upheld. J. C. Penney Company v. Gilford, 422 S.W.2d 25 (Tex.Civ.App.—Houston [1st Dist.] 1967, writ ref. n. r. e.); Ada Oil Company v. Dillaberry, 440 S.W.2d 902 (Tex.Civ.App.—Houston [14th Dist.] 1969, writ dism'd).

In determining whether or not the evidence supported the jury's finding to Special Issue No. 5 that Green acted with malice in instituting the criminal prosecution against Meadows it is necessary that we determine whether or not the evidence in support of that finding is full and satisfactory. Appellants adequately assigned this point in their motion for new trial. We conclude that their point in this court construed in connection with their argument is also sufficient.

In Sanders v. Harder, supra, the Supreme Court has stated that in those cases in which the "clear and convincing" rule is applicable the trial judge should exercise great caution in weighing the evidence, and if in his opinion the evidence in support of the verdict does not meet the test of that rule he may set it aside and order a new trial. In Briscoe v. Bright's Administrator, 231 S.W. 1082 (Tex.Com.App., Sec. D., 1921, judgment adopted), the court said that in a case requiring the facts to be established by clear and satisfactory evidence the credibility of the witnesses and the weight to be given their testimony were questions solely within the province of the jury, subject, however, to be revised by the trial judge and the court of civil appeals, and that the latter court might have reviewed the facts, set aside the verdict of the jury and remanded the cause for further trial.

 In determining whether Green was improperly motivated in presenting the matter to the District Attorney and whether he presented him facts which were known to him to be false or omitted facts which he knew or should have known to be material, we conclude on a review of all of the evidence that the credibility of Meadows was seriously impeached, particularly on the partnership issue, by the Assumed Name Certificate, the application for an import broker's license, the failure to file partnership income tax returns, and the notations which he made on stubs of the checks which he wrote for his salary. We conclude that a partnership between Green

and Meadows was not established by clear and convincing testimony. There is no evidence that Green knew that Meadows was claiming the status of a partner, other than the testimony of Meadows, at the time he went to the District Attorney's office. If we discount the testimony of Meadows, as we feel we must, we cannot say that there is clear and satisfactory evidence to support the conclusion that the statements made to the District Attorney by Green to the effect that Meadows was his employee and had written checks on the firm account for personal expenditures, and that he was not authorized to write company checks for personal expenditures, were false. He might honestly think that the act of an employee in writing checks on the company account in payment of personal debts constituted a criminal offense despite the fact that he was authorized to write checks to himself as draws on his salary, or to "cash" for the purpose of repaying personal funds expended on company business. There is no evidence that Green suggested to the District Attorney that Meadows was guilty of any criminal offense. There is no evidence that prior to July, 1969 Meadows had ever written company checks in payment of purely personal obligations on the Meadows & Green account. It is not clearly established by the evidence that Meadows was authorized by Green to write checks on the Meadows & Green account for such purposes. We conclude, therefore, that neither an improper motive nor an improper act is established by clear and convincing evidence and therefore that the jury's verdict finding that Green acted with malice in instigating criminal prosecution against A. K. Meadows is not supported by clear and convincing evidence.

[■ In so holding we have not overlooked the established rule that the existence of malice may be implied from want of probable cause. The jury has found want of probable cause and there is evidence to support such finding. There is no assignment of error in the motion for new

trial asserting that this finding is not supported by clear and convincing evidence. Malice is not a legal inference or a presumption of law, nor is it to be inferred as a legal consequence from want of probable cause. The want of probable cause is merely the basis of an inference of fact. 37 Tex.Jur.2d, Malicious Prosecution, Sec. 14, p. 535 et seq. We conclude that before such an inference could be drawn in the case at hand, want of probable cause would have to be supported by clear and convincing evidence. If it be determined from clear and convincing evidence that Green lacked probable cause to believe that Meadows was guilty of an offense, then this circumstance should be considered along with the other testimony in evidence in determining whether or not Green was actuated by malice in presenting the facts to the District Attorney.

Probable cause for a criminal prosecution has been defined as the existence of such facts and circumstances as would excite belief in the mind of a reasonable person, acting on facts within his knowledge, that the person charged was guilty of the crime for which he was prosecuted. 37 Tex.Jur.2d, Malicious Prosecution, Sec. 17, note 1, p. 538.

[■ Probable cause has been defined as " . . . a state of mind in that the facts are regarded from the point of view of the party prosecuting; the question is not what the actual facts were, but what he honestly and reasonably believed them to be." 54 C.J.S. Malicious Prosecution § 20, p. 977. It is undisputed that Meadows wrote checks on the Meadows & Green account payable to his personal creditors in payment of his personal indebtednesses. We do not find clear and convincing evidence that Green did not honestly and reasonably believe that Meadows exceeded his authority in writing such checks. While we find that there is some evidence of want of probable cause we consider that the jury's answer to such issue was not supported by clear and convincing evidence.

Malice is essential to the maintenance of an action for malicious prosecution. The trial court erred in entering judgment for Meadows for the damages which it found he sustained as the result of malicious prosecution.

In view of this holding, we do not reach appellants' points with relation to the damage issue.

 In his petition Meadows alleged the formation of a partnership between Green, the corporation and himself for the purpose of conducting a customs house brokerage business. He alleged that on termination of the partnership he was refused an accounting. The trial court submitted an issue on partnership and, predicated thereon, an issue on the amount due to Meadows. Based on the jury's answers to these issues the trial court awarded a recovery to Meadows and against Green and the corporation. The evidence clearly establishes that at the time Meadows alleged that the partnership was formed, he had no license to operate a customs house brokerage business. A partnership between Meadows and Green, therefore, would violate both the federal statutes and the rules and regulations formulated by the Secretary of the Treasury of the United States. Such a partnership is illegal and void and the courts will not enforce such a contract of partnership but will simply leave the parties where it finds them. Araiza v. Chapa, 319 S.W.2d 742 (Tex.Civ.App.—San Antonio 1958, writ ref. n. r. e.). In so holding we apply the rule that one seeking to invoke the equitable jurisdiction of a court must come into court with clean hands. The defense of unclean hands need not be pleaded, but the doctrine may be applied by a court sua sponte. Hall v. Collins, 167 S.W.2d 210 (Tex.Civ.App.—Amarillo 1942, rev'd on other grounds, Collins v. Hall, 141 Tex. 433, 174 S.W.2d 50 (1943); 30 C.J.S. Equity § 97, p. 1031. It has been held that one whose business violates the public policy of the state has no legal right to be protected and, not coming into court with

clean hands, cannot be given relief in a court of equity. City of Wink v. Griffith Amusement Company, 129 Tex. 40, 100 S. W.2d 605 (1936). The Supreme Court of Texas has held that equity will not adjust differences between wrongdoers. The complainant is first judged, and not until he is free from taint does equity proceed to determine whether he has been wronged. Humphreys-Mexia Company v. Arseneau, 116 Tex. 603, 297 S.W. 225 (1927); see also Fred Miller Brewing Co. v. Coonrod, 230 S.W. 1099 (Tex.Civ.App.—San Antonio 1921, writ ref.).

The trial court erred in entering a judgment for Meadows on his cause of action for an accounting of the alleged partnership business. The cause of action for an accounting is severed and judgment is here rendered that the plaintiff take nothing as to the severed cause.

The judgment of the trial court is reversed and the cause is remanded to the trial court on the cause of action based on malicious prosecution.